F2DLNEXC                     Conference

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   NEXT COMMUNICATIONS, INC., et
     al.,
 4
                     Plaintiffs,
 5
             v.                              14 CV 8190 (RJS)
 6
     VIBER MEDIA, INC.,
 7
                     Defendant.
 8
     ------------------------------x
 9                                           New York, N.Y.
                                             February 13, 2015
10                                           9:42 a.m.

11   Before:

12                   HON. RICHARD J. SULLIVAN,

13                                           District Judge

14                            APPEARANCES

15   WNF LAW, P.L.
          Attorneys for Plaintiffs
16   BY:  DANIEL FOODMAN (By Telephone)
          NEIL L. POSTRYGACZ
17
     MEISTER SEELIG & FEIN LLP
18        Attorneys for Defendant
     BY:  JEFFREY P. WEINGART
19        SUSAN M. SCHLESINGER

20

21

22

23

24

25
```

F2DLNEXC                          Conference

1              (In the robing room)

2              THE COURT:  This is Next Communications v. Viber

3    Media.  Let me just take appearances, and speak up nice and

4    loud so Mr. Foodman can hear everybody.  For the plaintiff?

5              MR. FOODMAN:  (By Telephone) This is Daniel Foodman on

6    behalf of plaintiff Next Communications and NxtGn, Inc.

7              THE COURT:  All right.  Good morning, Mr. Foodman.

8    And your local counsel was just announcing his name as you were

9    speaking, so let's do that again.

10             MR. POSTRYGACZ:  Neil Postrygacz also on behalf of

11   plaintiff.

12             MR. WEINGART:  For defendant, Jeff Weingart.

13             THE COURT:  Mr. Weingart.

14             MR. WEINGART:  And my colleague, Susan Schlesinger.

15             THE COURT:  Good morning to you.

16             This is our first conference.  I've reviewed the

17   complaint, as well as the premotion letters relating to

18   defendant's contemplated motion to dismiss.  I've also reviewed

19   the joint letter of the parties and the proposed case

20   management plan.

21             And I guess my first question out of the gate is why

22   the heck are you guys here?  It seems to me that nothing in the

23   complaint has anything to do with New York, right?  I know

24   there's an agreement that the parties specified New York choice

25   of law and New York choice of venue, but I scoured the

1    complaint to see what the heck any of this has to do with New

2    York.  There's a Florida corporation, a Panama corporation.

3    The contract doesn't seem to have been negotiated here.  None

4    of the events seem to have been here.  You just sort of like

5    New York, you can make it here, you'll make it anywhere, is

6    that the thinking?

7          MR. FOODMAN:  Your Honor, we believe that we needed to

8    bring this in New York because of the provisions in the NDA,

9    your Honor.

10         THE COURT:  Well, all right.  But there still has to

11   be I think more than just that to give you jurisdiction.  And,

12   certainly, I would have the authority on my own to transfer

13   venue if I nevertheless thought that there was another district

14   that had --

15         MR. FOODMAN:  If defendant would consent to

16   transferring this to Miami, we'd be happy to do that.

17         THE COURT:  Just explain to me the facts.  Does either

18   company do business here?  Let's start with the Next

19   Communications.  Do they do business in New York?

20         MR. FOODMAN:  Your Honor, they do business to the

21   extent people buy minutes from their telecom business.  But

22   they're not headquartered in New York.  They don't do business

23   in New York.  At least to my knowledge, they don't have offices

24   in New York, as well.

25         THE COURT:  And Viber is a Panama company.  I'm

1    reading between the lines, but it seems to me what's going on

2    here is maybe Viber didn't want to get home court in Florida

3    and that's why they wanted to be in New York.  But does Viber

4    do business here?

5           MR. WEINGART:  Viber does business in the U.S., but

6    not specifically New York, your Honor.  And also just to point

7    out, we're not a Panama corporation.  Although the entity that

8    was designated as a defendant is, Viber is now Viber Media

9    SARL, which is a Luxembourg corporation and no longer a Panama

10   corporation.

11          THE COURT:  Viber Media.

12          MR. WEINGART:  Viber Media SARL, which is on the first

13   line of our letter to you.

14          THE COURT:  In any event, Luxembourg.

15          Mr. Foodman.

16          MR. FOODMAN:  Your Honor, we operated based on the

17   language in paragraph 10 which says any lawsuit or other legal

18   proceeding shall be brought in federal court located in New

19   York County, State of New York -- personal jurisdiction of

20   those state or federal courts.

21          THE COURT:  I get that.

22          MR. FOODMAN:  That was the reason we did it and we

23   fully understand -- your Honor.

24          THE COURT:  My question is why did the parties do that

25   if there's no connection to New York.  So if there were a

F2DLNEXC                      Conference

1    contract between a New York corporation and a New Jersey

2    corporation, none of which do business other than in those two

3    states, and they decided, you know what, we're going to have

4    our disputes resolved in California, that's enough to give

5    California jurisdiction over the dispute?

6              MR. WEINGART:  Your Honor, we have no objection to

7    having the suit here.  We acknowledge that the NDA says what it

8    says about jurisdiction and venue.  Viber does business in the

9    U.S.  Certainly, it has customers that use --

10             THE COURT:  People use the app.

11             MR. WEINGART:  -- use the app here in New York,

12   certainly, and we have no issue with that.  And we think that

13   since the parties did choose this venue, it makes sense to have

14   the action here.  There would be no reason whatsoever to change

15   the venue to Miami or wherever Mr. Foodman would like to have

16   it.  There's no connection and the parties did not agree that

17   we should be in that court or any other court other than in New

18   York.

19             THE COURT:  I think the issue is am I required to

20   slavishly follow the parties in their agreement to bring an

21   action or bring actions in a state where there don't seem to be

22   any connections, right?  You have customers everywhere.  I

23   assume if you wanted them to be doing these in the courts of

24   Timbuktu because there must be somebody in Timbuktu who's got

25   the app or apps.

F2DLNEXC                    Conference

1          MR. WEINGART:  Sure.  There are hundreds of millions

2     of people who have the app.

3          THE COURT:  So I guess I think that's not a hundred

4     percent clear to me whether that's enough for jurisdiction.

5     And then in terms of transferring venue, that's certainly I

6     would, even if there is jurisdiction, the Court would have the

7     authority to transfer venue to a district that has more of a

8     connection to the operative facts.

9          So where were the meetings, where was the agreement

10    negotiated, where did all this stuff take place?

11         MR. FOODMAN:  Your Honor, a number of meetings did

12    take place in Miami.  Next does do business in Miami.  Its

13    headquarters are in Miami.  A lot of the discussions that have

14    to do with the operative facts took place in Miami.  So, you

15    know, if the Court were inclined to transfer, we believe that

16    Miami would be where the case should take place.  Obviously,

17    opposing counsel is correct that the parties did agree to New

18    York and so we're not going to take a position that's not the

19    case.  But certainly from the facts of this case, most of the

20    issues at hand took place in Miami and Next does do business in

21    Miami.

22         MR. WEINGART:  Your Honor, we don't agree with that.

23    There's nothing in the complaint that indicates that these

24    negotiations or the contract was executed there or that there's

25    any particular connection at all with Miami.  We don't agree

1    with that assertion.

2             THE COURT:  I'm not sure I'm bound by what's in the

3    complaint for purposes of a 1404 transfer of venue, but I would

4    need affidavits probably on this.

5             Where do you think the locus of operative facts is?

6    Where was this negotiated?

7             MR. WEINGART:  Where I think the locus of operative

8    facts is Viber is based and operates out of Israel, and these

9    transactions or this alleged transaction was centered in Israel

10   between Israelis.  And there's no reason to think that Miami

11   has anything to do with this transaction.

12            THE COURT:  Miami is where the plaintiffs were, right?

13            MR. WEINGART:  That's where they say they are, but

14   that's not where Viber is and that's not where any of these

15   discussions took place, to my knowledge.  The alleged

16   presentations in the complaint talk about presentations that

17   took place in Israel, as far as I know, not Miami.

18            THE COURT:  For the most part, the complaint doesn't

19   really get into geography.  So the issues under 1404 would be

20   where the witnesses are, for example, where the locus of

21   operative facts were, where the documents are.  That doesn't

22   count for much in the digital age.

23            Where are the witnesses in this case?

24            MR. WEINGART:  My witnesses are in Israel.

25            THE COURT:  Where are your witnesses, Mr. Foodman?

F2DLNEXC                        Conference

1          MR. FOODMAN:  Your Honor, a number of our witnesses

2     are in Miami, as well as some of the other witnesses that are

3     mentioned in the complaint also spent time in Miami.  For

4     example, Benny Shotto (phonetic) to my knowledge has an

5     apartment that he either rents or owns in Miami Beach.  Arik

6     Meimoun, the CEO of Next, resides in Miami.  Efrom

7     Ugasharef (phonetic) spends time between Miami and Israel.

8     Moshe Edru (phonetic), who is a witness in this case, he

9     resided in Miami to the best of my knowledge.  Next's business

10    is in Miami.  The Taranis (phonetic) I believe is in the U.S.,

11    but I'd have to confirm that to you.

12          But the meetings that took place, a number of the

13    meetings that took place took place in Next's offices or in a

14    restaurant in Miami.  One of the primary -- in this case took

15    place in a restaurant in Miami.  A lot of the discussions took

16    place with people coming from Viber to Miami to meet with Next

17    people.

18          So, obviously, we believe this case belongs in the

19    United States and certainly, if not Miami, then New York

20    pursuant to the NDA that was signed and agreed to by the

21    parties.

22          THE COURT:  Are there any witnesses in New York?

23          MR. FOODMAN:  Not that I'm aware of, your Honor.

24          THE COURT:  So let's hold that thought.  Now let's

25    talk about the contemplated motion by the defendants.

1          So there's three causes of action -- first, for breach

2     of contract, the second for misappropriation of trade secrets,

3     and the third for misappropriation of a business idea, which I

4     still have trouble getting my head around as a cause of action

5     but it seems to exist.

6          This is a premotion conference so I'm not ruling on

7     anything.  The reason I have premotion conferences is I think

8     that they can be useful to kick it around.  It gives me an

9     opportunity to do a little preliminary research, to review the

10    arguments, look at the facts alleged in a complaint, and to at

11    least give you my initial reaction.

12         I never tell a party they can't make a motion.  Even

13    if I think the motion is dead on arrival, I don't tell a party

14    they can't make a motion, but sometimes I say I think it's dead

15    on arrival.

16         I don't think this one is dead on arrival.  It does

17    seem to me, I'll tell you candidly, that the breach of contract

18    claim, there's enough there to survive.  Not a slum dunk.

19         MR. FOODMAN:  Your Honor, I can't hear you.

20         THE COURT:  It seems to me the breach of contract

21    claim would survive.  I'm not ruling.  That's my gut reaction

22    is that it seems that there's enough there to get past the

23    motion to dismiss stage.

24         The cause of action for misappropriation of a trade

25    secret strikes me as thin, at least as alleged.  There's

F2DLNEXC                    Conference

1    virtually no specificity as to what the trade secret was.

2    What's alleged, in essence, and I'm just paraphrasing, is that

3    there were discussions between the parties over technologies

4    that are very generally described in the complaint, that the

5    negotiations broke down.  There subsequently is a conversation

6    between individuals representing the two parties or employees

7    who are connected to the parties at which there's a discussion

8    that defendants are developing technologies that they didn't

9    have before that sounds similar to the technologies that

10   plaintiffs discussed during the negotiations and which would

11   have been covered by the NDA.

12          I think without more facts it's not clear to me that's

13   enough to establish a misappropriation of trade secrets.  I'm

14   not sure that you couldn't amend and add more skin on those

15   bones and you'd survive.  But at least as written, I think that

16   one is a close call.  That looks to me, at least today as I

17   stand here, like it might not make it through.

18          The motion to dismiss the third cause of action, the

19   third cause of action for misappropriation of a business idea,

20   I guess really turns on whether or not the idea that was

21   alleged to have been misappropriated is novel.  I think that's

22   a fair characterization as to your most significant argument

23   with respect to that cause of action?

24          MR. WEINGART:  That's a fair characterization of one

25   of the main arguments.

 1              THE COURT:  So it does seem to me -- I'm a little

 2    fuzzy.  Let me ask the plaintiffs, what is the idea that has

 3    been misappropriated?  Is it just the idea of downloading and

 4    streaming concerts, because that doesn't seem to be terribly

 5    novel as an idea.  It seems to me You Tube has been doing stuff

 6    like that.

 7              MR. FOODMAN:  Your Honor, it has to do with the

 8    celebrity business management, celebrity event management.

 9    And, your Honor, we adopted this portion of the complaint, if

10    your Honor recalls, we filed the complaint under seal.  So I

11    would just ask that anything we go over today I would at least

12    get the opportunity to make a motion after reviewing the

13    transcript to seal it if there's anything confidential.

14              We described celebrity event management which would

15    allow celebrities such as musicians to broadcast an event live

16    to millions of simultaneous fans over their mobile devices.

17    Each individual fan could use the app to view the celebrity

18    from a different perspective of their choice and also have the

19    experience of other fans.  So that goes along with the

20    underlying technology that's behind it which allows you to zoom

21    in and zoom out to different aspects, for example, on the stage

22    when a performer is singing, whereas a different person who is

23    watching the same exact show could zoom in and zoom out to

24    something completely different and it would not affect any of

25    the other users that are watching this concert.  It's all

F2DLNEXC                    Conference

1   coming from one camera, your Honor.  So it is, it's something

2   that doesn't exist on the market today.  There's nothing like

3   that that exists in the market today.

4           THE COURT:  I think that's one that obviously I'd see

5   what you say, what everybody says in the papers.  I think

6   they're all fairly close calls.  I don't think it's a slam dunk

7   either way on any of them.  My gut reaction is that's a close

8   call.  I'm not sure which way I would come out on that one.

9           That's my basic take on this.  I'm happy to hear you

10  now.  This is not an oral argument.  As I said, if you want to

11  go forward with the motion, you can go forward with the motion,

12  but that's my basic takeaway.

13          Go ahead, Mr. Weingart.

14          MR. WEINGART:  Yes, your Honor.  Thank you.

15          We this week just received a copy of a redacted

16  complaint which purports to contain the trade secrets and the

17  proprietary information that was allegedly conveyed and then

18  misused.  I would like to, if I could, I've highlighted in this

19  copy of the complaint those portions which have been redacted

20  from public view.

21          THE COURT:  I don't think we duplicated them on this

22  call.  At least thus far, it doesn't seem there's any need to

23  redact out or seal portions of this transcript, but I'll

24  certainly give the parties an opportunity to revisit that

25  later.

1           But, okay.  So what are you asking me to do?

2           MR. WEINGART:  I would just like to point you to, for

3      instance, pages 3 and 4 and 5, which are highlighted, which

4      those portions were redacted.  And the other portions of the

5      complaint that were redacted are highlighted.  My point being

6      that there's nothing that's highlighted here that constitutes

7      proprietary information or a trade secret or a protectable

8      business idea.  These are all very general concepts that have

9      been around for years and years to use software modules and

10     networking modules and hardware across telephony platforms and

11     VoIP.

12          So, first of all, the complaint was sealed improperly

13     and we move to unseal it.  That's the first thing.

14          The second thing is this complaint, the way it's

15     drafted, reveals that there was nothing proprietary.  In fact,

16     there was nothing proprietary that was ever communicated to

17     Viber.  This whole lawsuit is about Next approaching Viber and

18     wanting to make a sale to Viber and then sort of being a jilted

19     suitor in the sense that they signed an NDA.  The NDA expressly

20     says that there's no obligation to enter into an agreement or

21     conduct a business transaction and Viber chose not to do that.

22     Next kept coming and knocking at the door and trying to make it

23     happen and it didn't happen.  And there has been no source

24     code, specifications, methodologies, algorithms, software,

25     nothing was communicated to Viber that in any way constitutes

1   proprietary information or a trade secret of something that's

2   not already well-known in the marketplace and everything is

3   that is set forth and is highlighted in this complaint.

4            THE COURT:  I think you're basically restating what I

5   viewed as the problem with the second cause of action.  The

6   third cause of action I think also seems pretty thin, but I

7   think it turns on whether or not what is alleged in the

8   complaint is a novel idea.  But I think I'm agreeing with you

9   in what you just said about the second cause of action.

10           MR. WEINGART:  And it would be the third cause of

11  action, as well, because there's nothing that's novel at all

12  about streaming.  In paragraph 18 it talks about streaming

13  video from a concert so people can see it.  It's realtime, over

14  high definition, different views.  All those things have been

15  happening for years and years.  There's nothing novel about

16  that concept.  That cause of action also is -- they don't state

17  a cause of action.

18           First of all, even if there is a cause of action for

19  misappropriation of business idea, as you say, we don't really

20  think even to the extent there is one that it would apply in

21  this situation, nor have they in the complaint satisfied

22  whatever requirements might exist for that.

23           THE COURT:  The problem I have with the business idea

24  one, this is a motion to dismiss or contemplated motion to

25  dismiss, so I'm not sure I should be going too far outside of

F2DLNEXC                    Conference

1   the record to be seeing whether or not there is this kind of

2   technology and there is streaming video with different vantage

3   points.  It starts to sound like summary judgment.  On the

4   other hand, I have to be able to decide as a matter of law

5   whether what is alleged is in fact novel, which is one of the

6   elements of the third cause of action.

7            So I guess I don't want to cut you short, but it does

8   seem to me that this is one that we're probably going to need

9   to brief a little more.

10           MR. WEINGART:  I agree with you, your Honor.

11   Paragraph 18, even if you were looking at that in the issue of

12   whether it was going to be a motion to dismiss or motion for

13   summary judgment or treat it like a motion for summary

14   judgment, there's nothing in paragraph 18 that sort of sets up

15   why this was so novel and revolutionary and even pleads that

16   that's the case.  So to me, that should be ripe for motion to

17   dismiss.  But I know I'm repeating some of what you were saying

18   before.

19           THE COURT:  I think we live in a strange world under

20   Iqbal and Twombly.  For a cause of action based on

21   misappropriation of a business idea, are you required to plead

22   the fact which is really just a conclusion that this is a novel

23   idea?  I just think it all runs into just strange philosophy of

24   pleading standards which comes up from time to time in certain

25   cases.

1      So, look, I think certainly it sounds like you intend

2  to make a motion, but maybe we should first ask plaintiffs

3  whether they intend to amend the complaint.  So, Mr. Postrygacz

4  or Mr. Foodman, what do you think?

5      MR. FOODMAN:  Your Honor, not at this point because,

6  as your Honor says, you haven't really had an opportunity for

7  us to brief everything.  The definition of novelty, the fact

8  that we have something that does not exist in the market today,

9  that's something that is pretty unique.  That in and of itself

10 would lead us to believe it's novel.  If the Court ultimately

11 finds that the facts we pled aren't sufficient, that would be

12 something we need to determine at summary judgment, not motion

13 to dismiss stage, obviously, we would like the opportunity to

14 amend at that point.

15     THE COURT:  Not a chance.  That's the reason why I

16 have premotion conferences.  So you will invite me to have a

17 premotion conference, take premotion letters, then have

18 briefing, then I'll rule, and if I go along the line of what I

19 think I'm likely to rule, then you'd like the opportunity to

20 amend?

21     Now is your opportunity to amend.  Listen to me.  Your

22 opportunity is now.  You've seen the alleged deficiencies in

23 the complaint.  They've identified them for you.  I've given

24 you my initial reaction to what's in the complaint.  If you

25 want to amend, do it now.  But it's very unlikely you're going

1    to get another chance to amend after I've ruled on a fully

2    briefed and fully submitted motion.

3         MR. FOODMAN:  Your Honor, given the procedure you just

4    outlined, I think we would want to take the opportunity to take

5    a look at it and try to amend it because the Court is inclined

6    to think it's a close call, we would like the opportunity to

7    make it clear to the Court why it shouldn't be dismissed.  I

8    suppose given that instruction, then we should try to amend at

9    least those two counts that may be problematic.

10        THE COURT:  I think that's a conclusion that's not

11   illogical.  So how long would it take you to amend the

12   complaint?

13        MR. FOODMAN:  Your Honor, given the press of other

14   work, I would like at least 20 days, but certainly it's up to

15   your discretion.

16        THE COURT:  Twenty days.  Are you okay with that,

17   Mr. Weingart?

18        MR. WEINGART:  Yes, I'm okay with it, subject, of

19   course, to reserving the right to move to dismiss that amended

20   complaint.

21        THE COURT:  Of course.  Within 20 days we'll get an

22   amended complaint, if any.  Maybe they'll decide not to.  And

23   then I don't think we're going to go through another round of

24   premotion letters at that point.  Unless you have a brand-new

25   theory that you're going on, Mr. Weingart, as a basis to

F2DLNEXC                         Conference

 1   dismiss, then you can just go forward with your motion.

 2           So how long after the amended complaint do you think

 3   you'd need to file your motion, if in fact you're going to go

 4   forward with the motion?

 5           MR. FOODMAN:  Your Honor, may I ask a question,

 6   please?

 7           THE COURT:  Sure.

 8           MR. FOODMAN:  Are we limited to these counts?

 9           THE COURT:  Are we limited --

10           MR. FOODMAN:  You just mentioned a new idea, and I

11   have thought about an additional count.

12           THE COURT:  You can add new counts if you want to add

13   new counts.  If you want to amend, you can amend.  Now is the

14   time to amend.

15           MR. FOODMAN:  Thank you, your Honor.  I apologize for

16   interrupting.

17           THE COURT:  That's the downside of doing this by

18   phone.  The upside is it saves you a lot of time and saves your

19   client a lot of money and you don't have to buy a coat.

20           MR. FOODMAN:  I will be up there if there is a motion

21   to dismiss.

22           THE COURT:  For people who have to travel a distance,

23   it does make sense to at least ask if you can appear

24   telephonically because it may be of interest to do it that way.

25   If I think I really need you up here, I'll tell you, and there

1   may be times when you want to be here regardless and that's

2   fine too.  I don't hold it against somebody for appearing

3   telephonically when they have a great distance to travel.

4           If you want to amend, amend, and you can add new

5   things.  But I do think that if we're going to go forward on

6   the motions to dismiss, the motion to dismiss, I don't think

7   there's much point in doing another whole round of premotion

8   letters.  I think if there's a brand-new cause of action -- I

9   don't even think I need that.  If there's going to be a motion

10  to dismiss at that point anyway, let's just do it.

11          MR. WEINGART:  Okay.  Your Honor, we'd like 45 days to

12  move.

13          THE COURT:  Forty-five days.

14          MR. WEINGART:  Yes.

15          THE COURT:  All right.

16          MR. FOODMAN:  I didn't hear that, your Honor.

17          THE COURT:  Forty-five days to file a motion to

18  dismiss.  Forty-five days from the date of the new --

19          MR. WEINGART:  Correct.

20          THE COURT:  -- complaint.  Okay.  That's more time

21  than I --

22          MR. WEINGART:  Thirty is fine too.

23          THE COURT:  Are you all right with 45, Mr. Foodman?

24          MR. FOODMAN:  Your Honor, I think it's long.  We'd

25  like to move the case forward, obviously.

1            MR. WEINGART:  Thirty is fine.

2            THE COURT:  If you've got the press of other

3    business -- I think 20 days to amend might be a lot, but it

4    sounds like Mr. Foodman has some other things.  If you've got

5    other things --

6            MR. WEINGART:  I do have other things, which is why I

7    said 45 days.

8            THE COURT:  That's okay.  I will say, and maybe I

9    should have said this up front, I'm not inclined to stay

10   discovery given my view as to the breach of contract claim.  I

11   do think that one is likely to survive.  And so I think

12   discovery should proceed apace.  I'm not going to stay it

13   pending resolution of the motion.

14           MR. FOODMAN:  Thank you, your Honor.

15           MR. WEINGART:  We have a shorter schedule on that.

16           THE COURT:  Sometimes people presume that going

17   forward with the motion will automatically stop the discovery

18   schedule and other times they don't presume.  Sometimes I will

19   stay it if I think it's a likely winner and will resolve the

20   case.  Here it seems to me the breach of contract is going to

21   survive.

22           I would like the parties in their motion papers to

23   address the venue -- jurisdiction in the first place, and venue

24   more particularly under 1404(a) because I don't have to wait

25   for a motion.  So you're sort of on notice that I'm considering

F2DLNEXC                    Conference

1    transferring to Florida, or if there's some other venue that

2    would be more appropriate, I'm open to hearing it.  But it

3    seems to me New York has virtually nothing to do with this

4    dispute other than that there's a provision in the NDA that

5    references New York and chooses New York law and forum.  I'd

6    like you to address that in your papers.

7              MR. WEINGART:  Your Honor, should I wait, in terms of

8    the venue argument, would I be responding to their venue

9    argument or would you like each side to just go ahead and brief

10   that for you?

11             THE COURT:  Just go ahead and do it.  Nobody is making

12   the motion, so it's not like you're responding to somebody's

13   motion.  This is my motion.  This is the Court's sua sponte

14   motion.  So I've written on this before, if you want to get a

15   sense as to what I'm looking at.  But there's no mystery.  It's

16   a 1404 analysis.  It turns on the plaintiff's choice of venue,

17   which is entitled to some deference, but usually not much when

18   there's no real connection to the venue, as here.  The

19   convenience of the parties, convenience of the witnesses in

20   particular, third party witnesses especially, documents, which

21   really doesn't matter anymore because everything is electronic.

22             And then issues like what forum will have an easier

23   time of resolving the legal issues.  New York law would apply,

24   it seems to me, by contract.  I think most Florida courts, a

25   federal court in Florida could handle New York pretty well on

F2DLNEXC                    Conference

1   contract and misappropriation of trade secrets.  That's

2   basically it.

3          Whether one party is going to be inconvenienced.  It

4   seems like neither party is particularly inconvenienced by

5   being here.  In fact, it seems like the defendants, it's

6   easier, though not much easier, to fly to New York from Israel

7   than to Miami.  Probably direct flights for both.

8          MR. WEINGART:  It's a wash.

9          THE COURT:  I want you to focus on that.  I think

10  that's on my mind.

11         MR. FOODMAN:  Your Honor, may I ask a question?

12         THE COURT:  Sure.

13         MR. FOODMAN:  Do you want us to just issue a

14  memorandum of law on this issue to the Court separately of our

15  amendment or do you want us to incorporate it into our

16  amendment?

17         THE COURT:  Well, if you want to in your amendment

18  include some additional facts, you're certainly free do that.

19  Since there's going to be a motion to dismiss, I think there's

20  going to be briefing, probably, unless you do such a bang up

21  job in your complaint that the defendants say there's no point.

22  If there's in fact going to be a motion to dismiss, then I want

23  to, for efficiency's sake, put everything in one brief.  So

24  include a section at the end or at the beginning on

25  jurisdiction and venue.  Okay.

F2DLNEXC                    Conference

1          MR. FOODMAN:  And how would you like us to handle the

2     filing of the complaint?  Obviously, we have a difference of

3     opinion on whether there's confidential matter.  We would

4     obviously intend on moving again to seal our amended complaint.

5     Do you want us to do that by letter to the Court or how would

6     you like us to handle that?

7          THE COURT:  I think when you submit the complaint, why

8     don't you send it to me with a letter indicating why you

9     believe the presumption of open records has been overcome by

10    the need to protect trade secrets or other proprietary

11    information.

12         Judge Oetken was the judge who agreed to allow for the

13    redacted version to be docketed.  I kind of agree with the

14    defendants on this.  It didn't seem to me there was anything

15    proprietary in here that needed to be redacted.  So the amended

16    version may have more detail since one of the complaints was

17    that it's not sufficiently detailed.  So there might be a lot

18    more in the amended that does justify a sealed or redacted

19    amended complaint.

20         So I think tee it up.  Before you docket it, send a

21    courtesy copy to me with a letter brief that lays out why you

22    believe that the complaint should be filed under seal or

23    portions should be redacted with the redacted version publicly

24    docketed.  Okay.

25         MR. FOODMAN:  Okay.  Thank you, your Honor.  We will

 1  submit that letter along with both the redacted and nonredacted

 2  for your review.

 3          THE COURT:  Okay.

 4          MR. WEINGART:  Your Honor, I'd like to renew my motion

 5  to have the plaintiffs file the unredacted copy of the

 6  complaint, e-file it, because there is nothing in the redacted

 7  complaint that has any proprietary information or trade secrets

 8  and, of course, all that happened in an ex parte motion before

 9  Viber or our firm had any knowledge of it and it's

10  inappropriate.

11          THE COURT:  Yeah.  I think probably the most efficient

12  way to do it -- you have the unredacted complaint, right?

13          MR. WEINGART:  We have it, but it's not filed.

14          THE COURT:  No, I understand that.  It's not filed

15  because Judge Oetken signed an order saying it could be

16  docketed the way it was.

17          Why don't we wait for the amendment.  Address in the

18  amendment whether there is a continuing need to seal the

19  original complaint and to seal or redact portions of the

20  amended complaint.  So we'll deal with it all at once.  I think

21  that's the most efficient way.  It will be 20 days.  You can

22  then respond to that letter brief that I get that accompanies

23  the amended complaint and then I'll decide.

24          And generally I will tell you, candidly, I tend to

25  defer on the side of open records.  It is a presumption that

F2DLNEXC                    Conference

1    has to be overcome, and at least as I look at the complaint

2    here, it doesn't look to me it's been overcome.  So I think I'm

3    likely to unseal what Judge Oetken sealed.  I have great

4    respect for Judge Oetken.  I think he's terrific.  But we may

5    agree to disagree on this one and it's my case now.

6              MR. FOODMAN:  Just so that I understand your view on

7    this.  If what we allege is sufficient to state a cause of

8    action for a trade secret, how do we allege those trade secret

9    facts and have those facts revealed in a public record?

10             THE COURT:  What I think I've already said is I don't

11   think you've made a case for a trade secret.  So as currently

12   filed, it doesn't seem to me the complaint states any real

13   trade secrets.  The amended complaint may do a lot more in that

14   regard, which is why you'll get an opportunity to articulate

15   why it is that what's in the new complaint does need to be

16   sealed because there's a trade secret.

17             MR. FOODMAN:  Thank you, your Honor.

18             THE COURT:  If you want to persuade me I'm wrong about

19   the original, you'll get to do that in the letter as well.

20   Address both the need for continued sealing of what's already

21   filed and sealing of the new document as well.  Okay?

22             MR. FOODMAN:  Okay.  Thank you, your Honor.

23             THE COURT:  Great.  All right.  Then I guess let's

24   talk about the discovery schedule because I do think discovery

25   should start.  It doesn't seem to me whether I only allow the

1    complaint to go forward on the first cause of action or whether

2    it's all three, it seems to me discovery is going to be pretty

3    much the same.  Do you agree with that?

4          MR. WEINGART:  I just want to point out one thing,

5    your Honor.  In terms of the decision to allow discovery to go

6    forward, I think it would be a lot more efficient,

7    respectfully, if we waited.  And one of the reasons for that is

8    that we have been made aware of an article that appeared in the

9    Israeli press this week that quoted Arik Meimoun, who is the

10   founder of Next, and at length discussed this case and made

11   some very defamatory comments regarding Viber and Rakuten and I

12   can provide the Court with a copy.

13         THE COURT:  What does that have to do with discovery?

14         MR. WEINGART:  Well, because it's going to lead to at

15   least one counterclaim, your Honor.  And so we're going to have

16   at least one counterclaim we're asserting once we have to

17   answer a complaint, if we do, and that's going to affect the

18   scope of discovery.

19         THE COURT:  Well, maybe.  I guess I'll cross that

20   bridge when I get to it.  But I don't want to wait what will

21   effectively be months before we have any discovery.  So if

22   we're going to have an amended complaint in 20 days, we're

23   going to have your opening brief in 45 days.  We haven't

24   finished this schedule.

25         How long are you going to need to respond,

1  Mr. Foodman?

2              MR. FOODMAN:  To their document.

3              THE COURT:  Thirty days tops, unless you're in the

4  middle of a trial or something.

5              MR. FOODMAN:  I think that's fine.  Thirty days is

6  fine, your Honor.

7              THE COURT:  Then ten days for a reply brief.

8          So I have another matter I'm supposed to start.  So

9  I'll issue an order that sets out these dates with calendar

10  dates as opposed to numbered dates, but that will be the rough

11  schedule, okay.

12              MR. WEINGART:  Would you like oral argument, your

13  Honor?

14              THE COURT:  Not unless I think it's necessary.  So the

15  reason I have premotion conferences is to sort of kick the

16  tires and get my head in the game.  Sometimes I find I don't

17  need oral argument once I've done that.  The briefs then, I

18  think, speak for themselves.  If I think I need oral argument,

19  I'll let you know.

20              In the meantime, we'll go forward with discovery.  The

21  schedule you proposed is one I can live with.  If it turns out

22  that there's a counterclaim that requires tweaking of it, I'm

23  open to that.  We'll see when we get there.  But for now, fact

24  discovery will wrap up by September 30, as you proposed.

25              Expert discovery, which I guess will be more in the

1   nature of the technical trade secret issues and perhaps also

2   damages, that's what I'm assuming for experts.  Is that right,

3   Mr. Foodman?

4           MR. FOODMAN:  Yes, your Honor.

5           THE COURT:  You've got expert discovery that goes

6   pretty late.  I think there's a little bit of confusion on what

7   you have for the expert discovery.  You've got paragraph 8, I

8   talk about all expert disclosures, including reports,

9   production of underlying documents, and depositions shall be

10  completed by the deadlines that you set forth.  So that's

11  October 30 for plaintiffs, December 4 for defendants.  But then

12  you folks had given yourselves another six or eight weeks to

13  complete discovery in total.

14          What do you anticipate happening between December 4

15  and January 31?

16          MR. WEINGART:  Well, your Honor, we discussed this.

17  The parties discussed this the schedule at length, and this is

18  sort of what we came up with in terms of a reasonable.

19          THE COURT:  Usually I can see a week after expert

20  discovery is wrapped up to allow you to just sort of dot Is and

21  cross Ts.  But seven or eight weeks strikes me as excessive.

22          MR. WEINGART:  We were talking about the holidays at

23  the end of December, everybody goes away.  So we thought we

24  could just have discovery at the end of January.  That way, we

25  could, again, as you say, dot the Is and cross the Ts.

1          THE COURT:  That usually should take a week.  That's

2     just making sure that the errata sheet in the deposition has

3     been done.  So I'm going to say --

4          MR. WEINGART:  January 15 or something like that.

5          THE COURT:  December 31.  I'd normally give you a

6     week.  So it would be December 11.  I'll give you until the end

7     of December.  No reason why you have to use all that time.  But

8     I think that should be sufficient.

9          And then I'm going to pick a day for a post discovery

10    conference that will be middle of January.  Because I'm in the

11    robing room, because we're doing this on the speakerphone, I

12    don't have my calendar right in front of me.  Does anybody know

13    what their schedule is like in January that there's certain

14    days that don't work?  I'm presuming probably the Friday in the

15    middle of January.  I'd probably do it on a Friday.

16         MR. FOODMAN:  Your Honor, I don't have anything

17    scheduled.

18         THE COURT:  I'll pick a date.  If it turns out it's a

19    date you can't manage, you'll send me a letter asking to

20    adjourn it.

21         What I want, if there are going to be summary judgment

22    motions at that point with discovery over, same drill,

23    premotion letters.  You know how it goes.  So I'd like those on

24    the same day discovery closes, so December 31.

25         You've asked for a referral to Judge Netburn for

F2DLNEXC                    Conference

1    settlement discussions.  That's fine.  I'll make a referral to

2    her today for that.  When do you think would be the optimal

3    time to have a sitdown with Judge Netburn?  Sometimes folks

4    think let's do it right away, get in there before we start

5    spending a lot of money.  Other times say we've got motions

6    that could reduce or even resolve the case.  We've got some

7    discovery that's going to be absolutely essential to have

8    meaningful settlement discussions.

9            MR. FOODMAN:  Your Honor, for the plaintiff, we

10   certainly need some discovery to understand what was

11   communicated by Viber in order to have meaningful discussions.

12   So we will need some discovery to take place.

13           THE COURT:  So what's a date that is a safe date by

14   which you will contact Judge Netburn?

15           MR. FOODMAN:  From my perspective, sometime in the

16   summer would be appropriate.  Obviously, I would like to

17   coordinate it with opposing counsel.  But if the Court wants a

18   date now, I can look at my calendar.

19           THE COURT:  Just a ballpark date.  You're saying

20   summer, July 1?

21           MR. WEINGART:  I think that's early, your Honor.

22           MR. FOODMAN:  That's fine from my perspective.

23           MR. WEINGART:  Frankly, I don't think Viber is going

24   to have much of an interest in that process.  I think we should

25   let discovery play out.  Before we make dispositive motions,

1  maybe that's the time to do it.

2            THE COURT:  So you're saying after discovery has

3  wrapped up.

4            MR. WEINGART:  Correct.

5            THE COURT:  So I'm going to say after fact discovery.

6  So by September 30, you should contact Judge Netburn.  You can

7  then discuss with Judge Netburn when is an appropriate or

8  convenient time for you and she to get together.  But that's

9  the date by which you should contact her.

10           If between now and then you decide, hey, things have

11 changed, let's get in there and see Judge Netburn, you can do

12 that.  I'm going to make the referral today, but with the

13 notation that the parties will contact her no later than

14 September 30 and she'll be just waiting for you.  So don't go

15 past the deadline.  Don't make her hunt you down.  But if you

16 want to talk to her sooner, that's your prerogative.

17           MR. WEINGART:  Your Honor, if I could just to go back

18 to one point.  The time frame between finishing up experts and

19 making dispositive motions is extremely short in that schedule

20 and I was wondering whether you could push it into January at

21 least.

22           THE COURT:  Wait.  The date --

23           MR. WEINGART:  I think you said dispositive motions

24 would have to be by December 31.

25           THE COURT:  No.  I said a premotion letter would need

1    to be submitted by December 31.

2              MR. WEINGART:  Premotion letter.  Okay.  Thank you.

3              THE COURT:  And then we'll use the conference that

4    I'll schedule for mid-January to talk about any motions that

5    are contemplated.

6              MR. WEINGART:  That's fine.

7              THE COURT:  If there are none, we'll set a trial date.

8    But if there are motions, I'll set a briefing schedule and

9    we'll do what we did here today.  We'll kick the tires and talk

10   about the relative merits.  Sometimes I'll say this is clearly

11   a disputed issue of fact.  But, again, I never tell the party

12   they can't make a motion.  You have a right to make a motion.

13   Okay.

14             The only thing I refer to a magistrate judge is

15   settlement.  Everything else I keep myself.  So if there are

16   discovery disputes, those should come to me with the following

17   proviso.  I expect that the parties will confer and work

18   professionally and courteously to try to resolve whatever

19   disputes they have and so do that.

20             If after a reasonable period of time it turns out that

21   you just have a good faith disagreement about discovery, tee it

22   up for me in a joint letter, which shouldn't be more than five

23   pages, laying out your respective positions.  I will then

24   resolve it probably just on the basis of that letter.  If I

25   need more information, maybe I'll get you on the phone.  But

1  that's usually the way it goes.

2          I will tell you candidly in 98 percent of my cases, I

3  have no disputes at all.  The parties manage it beautifully

4  without my involvement.  Once in a while, they have good faith

5  disputes.  They just have a different view as to what's

6  appropriate and they tee it up for me and I resolve it.

7          1 percent of the cases I have the equivalent of a root

8  canal because the parties hate each other and think if they're

9  not inflicting pain, they're not doing right.  And you don't

10 want to be those lawyers because those are the lawyers that

11 make me question my career choices.  And so it's just not worth

12 it.  So don't be those lawyers.

13         If somebody is in the middle of a trial, you cannot

14 expect they're going to call you in ten minutes when you've

15 left then a voice mail or sent an email.  On the other hand,

16 even being on trial doesn't mean you're AWOL for two weeks.  We

17 don't live in that kind of world.  Be courteous, be

18 professional.  You obviously have to zealously represent your

19 clients, but it doesn't have to be an adversarial system in the

20 sense of being unpleasant.

21         I have no reason to think that you need that speech.

22 I just find when I don't give that speech is when we get into

23 trouble.  So to take it in the spirit that it's conveyed.

24         All right.  So I will issue an order today that lays

25 out these various dates.  And I'll docket the case management

1   plan with the handful of insertions that I just made.

2          Is there anything else we should discuss before I jump

3   on a criminal matter that they're waiting on?

4          MR. WEINGART:  No, your Honor.

5          MR. FOODMAN:  Nothing from the plaintiff, your Honor.

6          THE COURT:  Okay.  Let me thank the court reporter.

7   If anyone needs a copy of the transcript, you can take it up

8   with the court reporter I guess through the website because I'm

9   going to need to commandeer here for this other matter I've

10  got.  Thanks.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25