UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
(SULLIVAN/NETBURN)

Civil Action No. 14-cv-08190-RJS

Next Communications, Inc.,
a Delaware corporation, and
NxtGn, Inc., a Florida corporation,

    Plaintiffs,

v.

Viber Media, Sarl,
a Luxembourg corporation

    Defendant.
_____/

## AMENDED COMPLAINT

Plaintiffs Next Communications, Inc. and NxtGn, Inc., bring this action for permanent injunctive relief, and for damages, against Defendant Viber Media, Inc.

## PARTIES

1. Plaintiff Next Communications, Inc. ("Next") is a Delaware corporation with its principal place of business in Miami, Florida.

2. Plaintiff NxtGn, Inc. ("NxtGen") is a Florida corporation with its principal place of business in Miami, Florida.

3. Defendant Viber Media, Sarl. ("Viber") is a Luxembourg corporation, with its principal place of business in Cyprus.

**JURISDICTION AND VENUE**

4.      Jurisdiction for this action arises under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiffs and Defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.      Personal jurisdiction exists over Viber because it expressly agreed to the personal jurisdiction of this Court.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Viber is subject to the Court's personal jurisdiction with respect to this action.

**FACTUAL ALLEGATIONS**

7.      Next is a provider of wholesale long distance voice, data, and video services for wired and wireless telecommunications carriers throughout the world.

8.      Next controls, through its subsidiary, NxtGn, Inc., a platform that supports routing, monitoring, and billing software, along with a unique switchless connectivity solution, which makes Next one of the most efficient and technologically advanced telecommunications companies in the world.

9.      NxtGn developed a unique video platform that delivers all the functions of a distributed cloud-based high definition video network, but integrated with traditional voice networks.

10.     In 2012, NxtGn partnered with Telarix, Inc. ("Telarix") to create a proprietary video platform that can deliver high definition video services, including video calling, teleconferencing, and other combined video and audio services on wired and wireless networks at low fixed costs, and low per-minute billing rates.  This platform is called "AVYDA Powered by Telarix." ("AVYDA").

11.     AVYDA uses NxtGn's proprietary technology to allow mobile (including iOS and Android), PC, and tablet devices running on 3rd generation ("3G"), 4th generation ("4G"), or LTE networks to participate in high definition video conference calls. Using a single router developed by Cisco Systems, Inc., ("Cisco"), AVYDA can connect over 16,000 simultaneous high definition video and voice calls, while processing 250 new calls per second. AVYDA also incorporates Telarix's back office services to allow network carriers to interconnect video calls, while ensuring that Call Detail Records are created.

12.     NxtGn developed the proprietary technology used in AVYDA over the course of 3 to 4 years. NxtGn's proprietary technology solves several key challenges, including (1) the ability to bill end users for video calls on a per minute basis, (2) the ability to stream video over low bandwidth 3G connections (as well as 4G and LTE), which involves unique know-how related to the use of certain compression codecs, (3) the ability for a wide range of devices, including iOS, Android, computers and tablets to effectively communicate with each other, and (4) support for IPv6, which is a new standard for internet protocol connections that is beginning to replace IPv4 technology. IPv4, which is currently in wide use, will soon be obsolete due to certain limitations, particularly the number of available IP addresses.

13.     NxtGn solved these challenges using a unique combination of networking hardware, signaling servers, and proprietary software. The end result is the ability to deliver interactive high definition video conferencing to any device, even over low-bandwidth connections.

14.     The process developed by NxtGn allows these various technologies to communicate with each other efficiently and effectively, eliminating the need for certain hardware components that ordinarily would have to be used in order to provide videoconferencing services. This allows for a reduction in infrastructure development and capital investment.

15. NxtGn's solution goes beyond traditional videoconferencing available on most mobile apps, however. Indeed, NxtGn developed a unique method for various software and proprietary network technologies to interact in order to provide proprietary services (the "NxtGn Proprietary Services") that allow Next and NxtGn to deliver advanced high definition videoconferencing to over millions of individual users across a wide-range of devices.

16. Next and NxtGn combined the NxtGn Proprietary Services with video conferencing technology that it licensed from Vidyo, Inc. to develop an app (the "NxtGn App"). The NxtGn App is not currently available for use by the general public.

17. The NxtGn App allows for several unique advanced videoconferencing features, which are made possible by the NxtGn Proprietary Services. The NxtGn App uses a proprietary process to scale individual routers, which allows millions of people to connect simultaneously to the same videoconferencing feed.

18. The NxtGn App, when used with Cisco's Telepresence videoconferencing technology, allows for each individual user participating on a videoconference to zoom-in or zoom-out, using their touchscreen device on a 360-degree video feed, without impacting how the video feed is presented to other users. Effectively this allows each individual user to customize how the video is presented to them over their mobile device.

19. The NxtGn Proprietary Services also include a unique technique for routing calls, allowing for detailed traffic monitoring, reporting, and billing. This means that detailed call records can be kept for each individual user on a large-scale videoconferencing call. This technique provides several avenues to monetize Next and NxtGn's advanced videoconferencing services that were not previously available, including the ability to bill end-users on a per-minute basis for large-scale videoconferencing calls delivered over mobile networks  Typically, videoconferencing calls

4

delivered over mobile networks are billed by the amount of data used, not the amount of time spent on the call.

20. In sum, Next and NxtGn took certain existing videoconferencing and networking technology, along with certain proprietary networking technology and software, and developed a unique set of processes that, when combined, allow for:

a. The efficient delivery of high definition videoconferencing over low-bandwidth networks;

b. The ability for various components that previously communicated using various different protocols to communicate directly;

c. The ability to scale the number of users on a single videoconference to over a million simultaneous users;

d. The ability to deliver advanced videoconferencing features, including the ability for each of potentially millions of individual users to customize their view of the video feed without impacting the experience of other users; and

e. The ability generate detailed records of individual usage, which in turn allows for the ability to monetize advanced videoconferencing services, including the ability to charge end-users on a per-minute basis.

21. The specific components used, the way these components fit together as building blocks to form a unique whole, and the process by which these components interact and work efficiently are Next and NxtGn's trade secrets. They are the result of years of research and development. Next and NxtGn closely guard these processes, and only disclose details regarding the specific components involved and the way that the components work together, when necessary, and only to those that agree to keep the information secret by signing a non-disclosure agreement.

22. Next developed a novel and unique business idea that incorporates the technology in the NxtGn App. That business idea is to use AVYDA, the NxtGn Proprietary Services, and the technology in the NxtGn App for "Celebrity Event Management." In essence, Celebrity Event Management would allow a celebrity, such as a musician, to broadcast a live, interactive event to millions of simultaneous fans over their mobile devices.

23. This is not simply streaming video online, but rather is a massively scaled videoconference, making it a social experience, something that is not commercially available. And, using Next and NxtGn's technology and the methodology described above, fans can customize their view of the celebrity event from the perspective of their choice, without impacting the experience of other fans.

24. Using NxtGn's Proprietary Services, fans who follow a live event on their mobile devices can be billed on a per-minute basis.

25. Thus, the Celebrity Event Management business idea is novel, as it allows end-users to follow celebrities in a unique way, using Next and NxtGn's advanced teleconferencing services, and allows the broadcaster to bill for and ultimately monetize the service in a unique way, namely using per-minute billing for a massive, live streaming event.

26. The NxtGn Proprietary Services and Celebrity Event Management business idea have been maintained confidentially by NxtGn and Next, and have been made available only to third parties that have signed a non-disclosure agreement, including Telarix, Cisco, Vidyo, and later Viber.

### Viber's Interest in Next and NxtGn's Technology

27. Viber first launched its Viber App in December 2010. The Viber App allowed for text, picture, and video messaging, as well as voice calling, on a consumers' iPhone. Viber later

made its Viber App available on other mobile platforms, including Android and Windows Phone, as well as on Windows and Mac personal computers.

28. One of Viber's major competitors is Skype. However, unlike Skype, Viber was unable, until recently, to transmit high quality video calls over mobile devices.

29. In or about June 2012, Viber contacted Next in order to see whether Next could assist Viber in developing the ability to transmit high quality video calls over mobile devices.

30. On June 22, 2012, to facilitate possible business transactions between Viber and Next, the parties entered into a Non-Disclosure and Confidentiality Agreement (the "NDA"). (*See* Ex. 1, June 22, 2012 NDA). The NDA prohibits the disclosure of any proprietary information to any third parties, and also restricts the use of any proprietary information solely for the purpose of facilitating a possible business transaction between Viber and Next. (*Id.* ¶ 2).

31. After signing the NDA, Viber initially worked with Telarix regarding a possible transaction that would include the NxtGn Proprietary Services.

32. Next and Viber met face to face in May 2013 at Next's suite at the ITW trade show in Chicago. There, Viber again expressed interest in Next's video conferencing technology, and asked for a demonstration.

33. Telarix contacted Viber on May 21, 2013, and provided Viber via email a brief presentation dated September 21, 2012, which highlighted the benefits of AVYDA. That presentation contained confidential information related to NxtGn Proprietary Services, which Telarix provided to Viber with Next's consent, and pursuant to the NDA between Next and Viber.

34. On June 5, 2013, Arie Frenklakh, who was then an employee of Viber, contacted Telarix. Mr. Frenklakh introduced Telarix to Leonid Shmulevich, Viber's Vice President of

7

Research and Development, and asked for a technical discussion to understand how AVYDA would fit into Viber's plans for video.

35.     On or about June 11, 2013, Next demonstrated the NxtGn App to Viber. As part of the demonstration, Franklakh downloaded the app onto his iPhone. The app cannot be used without a code that is provided by Next.

36.     On June 13, 2013, Telarix, with Next's consent, made another presentation to Viber, this time to Viber's Chief Technology Officer, and members of Viber's research and development team. This presentation contained a much more in-depth description of the NxtGn Proprietary Services, including the process by which the NxtGn Proprietary Services can be put to use to provide advanced videoconferencing technology like that found in the NxtGn App.

37.     Next also shared its confidential Celebrity Event Management business idea with Viber, as an example of how Viber could integrate AVYDA and the NxtGn Proprietary Services into Viber's app to monetize the advanced videoconferencing technology made possible by the NxtGn Proprietary Services. Next described the concept as similar to major social media services, but using live HD video instead of short text messages or images.

38.     Next explained that the implementation of the Celebrity Event Management business idea is possible using the NxtGn Proprietary Services, including the billing model, namely the ability to charge users on a per-minute basis.

### VIBER Ceases Communication with Next, and is Acquired by Rakuten

39.     After the June 13, 2013 presentation, Viber told Telarix that it was only interested in the video solution, which consisted of the NxtGn Proprietary Services, NxtGn App, and Celebrity Event Management business idea, and not interested in the services that Telarix would provide.

40. On July 8, 2013, Viber asked Next to be its single point of contact regarding a potential deal going forward. Next agreed to continue working with Viber in order to help it develop a video solution.

41. However, Viber apparently decided that it had gained enough information from Next and NxtGn regarding the NxtGn Proprietary Services, including what components are used and the methods by which they interact. This allowed Viber to misappropriate Next's valuable proprietary information in order to develop advanced videoconferencing technology for its app without having to incur the significant cost, in both time and money, to research and develop its own technology.

42. Thus, after receiving a detailed presentation regarding the NxtGn Proprietary Services, the NxtGn App and the Celebrity Event Management business idea, Viber ceased all communications with Next until late January 2014, when a Viber representative requested that Next's CEO, Mr. Arik Meimoun meet in April 2014 in Israel with Viber's CEO.

43. On February 17, 2014, Rakuten, Inc., a Japanese online retailer, announced that it would buy Viber for $900 million. Viber had a net operating loss of $29.5 million the prior year, and the Viber App had no videoconferencing abilities as of the date of the acquisition.

44. Upon information and belief, Viber has difficulty monetizing its large user-base, which causes it to operate at a loss. Indeed, according to a February 14, 2014 report in the Wall Street Journal, Viber had only $1.5 million in revenue during 2013. (*See* Ex. 2).[1]

### Next Learns that Viber Misappropriated its Trade Secrets and Business Idea

45. In March 2014, Mr. Benny Shabtai, whose family owned a 55.2% stake in Viber before it was purchased by Rakuten, met with Mr. Meimoun on a mutual friend's yacht, with several other individuals, including a very well-known individual who was a guest of Mr. Shabtai's.

---

[1] Incidentally, this article, which primarily addresses the sale of Viber to Rakuten, explains that Rakuten has been "active in acquisitions in video content distribution." (*Id.*)

9

46. Mr. Shabtai was not present at any of the 2013 meetings between Next, Telarix, and Viber.

47. The next day, the very well-known friend of Mr. Shabtai had a face to face meeting with Mr. Meimoun. Following that, a different mutual friend of Mr. Meimoun and Mr. Shabtai requested, on several different occasions, a follow-up meeting with Mr. Meimoun and Mr. Shabtai to discuss investment opportunities.

48. On March 25, 2014, Mr. Shabtai and Mr. Meimoun, along with other representatives from Next, held a lunch meeting. At that meeting, Mr. Meimoun, explained to Mr. Shabtai the various capabilities of Next and its subsidiaries.

49. At the same meeting, Mr. Shabtai also discussed Viber's acquisition by Rakuten. During that discussion, Mr. Shabtai described what he called an unfinished feature in the Viber application. The unfinished feature that Mr. Shabtai described was, nearly verbatim, the Celebrity Event Management business idea that Next confidentially disclosed to Viber.

50. Mr. Meimoun asked Mr. Shabtai where he learned about this idea. Mr. Shabtai responded that he learned of the idea on a document that was submitted to Rakuten ahead of the acquisition.

51. In April 2014, Mr. Meimoun met with Viber's CEO. During that meeting, Viber's CEO indicated that he was unaware of the meetings between Viber, Next, and Telarix that took place in June 2013 where Viber sought and obtained detailed, confidential information relating to the NxtGn Proprietary Services and the Celebrity Event Management business idea.

52. Upon information and belief, Arie Frenklakh, the Viber employee who coordinated the June 2013 meetings, was terminated shortly after the April 2014 meeting between Mr. Meimoun and Viber's CEO.

53. In May 2014, representatives from Viber approached Telarix at the same trade show in Chicago. In stark contrast to a year earlier, when Viber informed Telarix that it was only interested in the Next and NxtGn technology that formed part of AVYDA, but not Telarix's services, this time Viber expressed interest in using the Telarix services that formed part of AVYDA.

54. The fact that Viber sought out Telarix for back-office billing services in connection with advanced videoconferencing technology further suggests that Viber is using the information it learned about the NxtGn Proprietary Services to develop its own advanced videoconferencing technology. Logic dictates that without the back-office billing services, Viber could not monetize the NxtGn Proprietary Services and Celebrity Event Management business idea.

55. To be sure, the fact that in May 2014 Viber suddenly needed Telarix's services, combined with Mr. Shabtai's revelations during the March 25, 2014, lunch meeting, shows that Viber misappropriated the NxtGn Proprietary Technology and Celebrity Event Management business idea.

56. On November 18, 2014, Viber announced "Public Chats," which it claims is "a new way to get behind the scenes with music, film, fashion, sports or whatever else you're into." *See* Ex. 3.

57. "Public Chats" is, upon information and belief, the first step toward Viber's implementation of Next's Celebrity Event Management Business Idea. Indeed, Viber advertises that by using Public Chats users can "[t]ake this vibe backstage, get closer to [their] favorite artists and experience what it's like to be a superstar." *Id.*

## Count I – Breach of Contract

58. This count is brought by Next against Viber.

11

59. Next re-alleges each allegation contained in paragraphs 1 through 57 of this Complaint as if fully set forth herein.

60. On June 22, 2012, Next and Viber entered into a Non-Disclosure and Confidentiality Agreement. (Ex. 1).

61. The NDA is a valid, binding contract governed by New York law.

62. The NDA defines "Proprietary Information" as information that the disclosing party "desires to protect against unrestricted disclosure or competitive use, which is not generally available to the public and which the Disclosing Party designates as such." (Ex. 1 ¶ 1(c)).

63. The NxtGn Proprietary Services, the Celebrity Event Management business idea, and related information shared with Viber during the duration of the NDA are Proprietary Information, were designated as such, and were novel to Viber.

64. The NDA restricts a party that received Proprietary Information from disclosing it to any third parties, including any employees, agents, directors, officers, or representatives of any company with which the receiving party is or shall become affiliated. (Ex. 1 ¶ 2(a)).

65. The NDA also restricts a party that received Proprietary Information from using it for any purpose other than "assessing possible business transactions between the parties." (Ex. 1 at 1; ¶ 3(c)).

66. Next has fully performed its obligations under the NDA.

67. Viber materially breached the NDA by using the Proprietary Information for purposes other than assessing a possible business transaction with Next. Specifically, upon information and belief, Viber used the Proprietary Information to develop its own advanced videoconferencing technology like that found in the NxtGn App. Indeed, Next learned that this technology is currently an unfinished feature in the Viber App.

68. Viber materially breached the NDA by, upon information and belief, sharing the Proprietary Information with Rakuten before Rakuten acquired Viber.

69. Further, the NDA provides that "monetary damages for breach of the obligations in this Agreement may not be adequate and that the Disclosing Party shall be entitled to injunctive relief in addition to any other available remedies." (Ex. 1 ¶ 4).

70. Viber's continued use of Next's Proprietary Information has and will cause Next serious irreparable harm, because being the first competitor in an emerging market is a business advantage of immeasurable value.

71. Accordingly, Next is entitled to permanent injunctive relief to prevent Viber from using and further disseminating Next's Proprietary Information. In addition, as a proximate cause of Viber's breach of the NDA, Next has been significantly damaged in an amount to be determined at trial.

### Count II – Misappropriation of Trade Secrets

72. This count is brought by Next and NxtGn against Viber.

73. Next and NxtGn re-allege each allegation contained in paragraphs 1 through 57 of this Complaint as if fully set forth herein.

74. Next owns valuable trade secrets, including the NxtGn Proprietary Services.

75. The NxtGn Proprietary Services are a protectable trade secret because they are a unique combination of software and proprietary network technology that is not generally known by or available to the public. They are neither obvious nor easily duplicated.

76. Next and NxtGn derive economic value from the NxtGn Proprietary Services because they are not known to or readily ascertainable, using proper means, by third parties who can obtain economic benefit from their use.

77. Next and NxtGn have undertaken efforts to ensure that its trade secrets are kept secret and not generally known to the public by only sharing its trade secrets after an NDA is executed. For example, Next attempted to limit the use of the NxtGn Proprietary Services by entering into the NDA with Viber, which only permitted Viber to access information related to the NxtGn Proprietary Services "for the purpose of assessing possible business transactions between the Parties…." (Ex. 1 at 1).

78. Upon information and belief, Viber knowingly and willfully misappropriated the NxtGn Proprietary Services, in breach of the NDA, and is exploiting them for its own economic advantage over its competitors, including Next and NxtGn.

79. Specifically, Next and NxtGn learned that Viber misappropriated the NxtGn Proprietary Services to develop its own advanced videoconferencing technology like that found in the NxtGn App. Indeed, Next learned that this technology is currently an unfinished feature in the Viber App.

80. Viber's continued use of the NxtGn Proprietary Services will cause Next and NxtGn serious irreparable harm, because being the first competitor in an emerging market is a business advantage of immeasurable value.

81. Accordingly, Next and NxtGn are entitled to permanent injunctive relief to prevent Viber from using and further disseminating the NxtGn Proprietary Services. In addition, as a proximate cause of Viber's misappropriation, Next and NxtGn have been significantly damaged in an amount to be determined at trial.

### Count III – Misappropriation of a Business Idea

82. This count is brought by Next against Viber.

83. Next re-alleges each allegation contained in paragraphs 1 through 57 of this

Complaint as if fully set forth herein.

84. A legal relationship existed between Next and Viber in the form of the NDA.

85. Next and Viber also had a contract implied-in-fact, because Next presented its business ideas with the understanding that it would be compensated should Viber adopt Next's trade secrets, proprietary information, or ideas.

86. Upon information and belief, Viber knowingly and willfully misappropriated from Next, and is exploiting for its own economic advantage, a novel and concrete idea – namely the unique Celebrity Event Management business idea that can be implemented using, in part, the NxtGn Proprietary Services.

87. The Celebrity Event Management business idea is novel and unique for several reasons:

   a. There is nothing currently on the market that allows for millions of simultaneous users to participate in an interactive videoconference with a celebrity from any device while choosing their own unique vantage point;

   b. It incorporates Next and NxtGn's advanced videoconferencing technology, something that would otherwise have been unknown to Viber; and

   c. It allows for a unique way to monetize a social media experience; namely by charging users on a per-minute basis for viewing a live, large-scale videoconference.

88. Upon information and belief, Viber is implementing the Celebrity Event Management business idea into its Viber App, and thus plans to launch a competing service.

89. Viber's continued use of the NxtGn Proprietary Services will cause Next serious irreparable harm, because being the first competitor in an emerging market is a business advantage of immeasurable value.

90. Accordingly, Next is entitled to permanent injunctive relief to prevent Viber from using its Celebrity Event Management business idea. In addition, as a proximate cause of Viber's misappropriation, Next has been significantly damaged in an amount to be determined at trial.

### Count IV – Unjust Enrichment

91. This count is brought by Next and NxtGn against Viber.

92. Next and NxtGn re-allege each allegation contained in paragraphs 1 through 57 of this Complaint as if fully set forth herein.

93. As detailed above, Viber misappropriated Next and NxtGn's confidential information and is using it to develop its own competing advanced videoconferencing technology within the Viber app.

94. Thus, Viber has benefitted by saving the significant time and cost that it would otherwise have had to incur in order to research and develop this technology.

95. Viber obtained this substantial benefit at the expense of Next and NxtGn, under circumstances in which it would be inequitable to allow Viber to retain that benefit.

### PRAYER FOR RELIEF

WHEREFORE, Next and NxtGn respectfully request a jury trial on any issues so triable, and that this Court enter judgment:

A. Enjoining Viber, its officers, subsidiaries, parents, affiliates, divisions, agents, servants, employees, and attorneys, and those persons in active concert or participation with it who receive actual notice of the order by personal service or otherwise, from:

(i) directly or indirectly misappropriating or attempting to misappropriate the NxtGn Proprietary Services;

(ii) launching, or attempting to launch, any service that includes any of the NxtGn Proprietary Services, including but not limited to the Celebrity Event Management business idea;

(iii) disclosing to any third party any other confidential information that Viber learned from Next pursuant to the NDA;

B. Ordering Viber to account for all Proprietary Information, as defined in the NDA, including but not limited to the NxtGn Proprietary Services and the Celebrity Event Management business idea, in its possession, custody, or control;

C. Ordering Viber to return all Proprietary Information, as defined in the NDA, to Viber, including but not limited to the NxtGn Proprietary Services and the Celebrity Event Management business idea;

D. Ordering Viber to account for all Proprietary Information, as defined in the NDA, including but not limited to the NxtGn Proprietary Services and the Celebrity Event Management business idea, that Viber provided to third parties, and identify all third parties to whom any Proprietary Information was disclosed;

E. Ordering Viber to use its best efforts to obtain the return of any Proprietary Information from the parties required to be identified pursuant to Paragraph D;

F. Awarding Next and NxtGn compensatory and punitive damages, including disgorgement of any ill-gotten revenue, in an amount to be determined at trial;

G. Awarding Next and NxtGn a reasonable royalty for Viber's use of Next's and NxtGn's trade secrets and business idea;

      H.      Awarding Next and NxtGn their costs, disbursements, and reasonable attorney's fees in connection with this action; and

      I.      Any such other and further relief as this Court may deem just and equitable.

Dated: March 5, 2015

                                    Respectfully submitted,

                                    /s   *Daniel Foodman*
                                    Daniel Foodman (pro hac vice)
                                    df@wnflaw.com
                                    Carlos Nunez-Vivas (pro hac vice)
                                    can@wnflaw.com
                                    WNF Law, P.L.
                                    *Counsel for Plaintiffs*
                                    1111 Brickell Avenue
                                    Suite 2200
                                    Miami, Florida 33131
                                    Tel.: (305) 760-8500
                                    Fax: (305) 760-8510

                                    Neil Postrygacz (NP-1975)
                                    neil@artfulaw.com
                                    419  Lafayette Street
                                    New York, NY 10003
                                    Tel.: (212) 392-4945
                                    Fax: (646) 514-1997

## CERTIFICATE OF SERVICE

I certify that on March 5, 2015, this document was served by electronic mail upon Jeffrey Weingart, Esq., Meister, Seeling & Fein, LLP, at jpw@msf-law.com pursuant to this Court's instructions on February 13, 2015.

                                  /s   *Daniel Foodman*
                                  Daniel Foodman