UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

No. 14-cv-8190 (RJS)
_____

NEXT COMMUNICATIONS, INC. AND NXTGN, INC.,

Plaintiffs,

VERSUS

VIBER MEDIA, INC.,

Defendant.
_____

OPINION AND ORDER
March 30, 2016
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Next Communications, Inc. and NxtGn, Inc. (collectively, "Next") bring this action against Defendant Viber Media, Inc. ("Viber'), alleging that Defendant misused confidential information that Plaintiffs communicated to Defendant pursuant to a non-disclosure agreement. Now before the Court is Defendant's motion to dismiss the Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendant's motion to dismiss is granted with respect to Plaintiffs' claim for misappropriation of a business idea, but denied with respect to their claims for misappropriation of trade secrets, breach of contract, and unjust enrichment.

I. BACKGROUND

A. Facts

This case concerns software and mobile applications used in connection with videoconferencing and messaging over the internet.[1] Next is a provider of long-distance voice, data, and video services for telecommunications carriers. Viber is the maker of a well-known and widely used mobile app that allows users to send voice

_____

[1] The following facts are taken from the Amended Complaint, filed on July 16, 2015 (Doc. No. 61 ("Amended Complaint" or "Am. Compl.").) In ruling on Defendant's motion, the Court has also considered Defendant's memorandum of law (Doc. No. 57 ("Mem.")), Plaintiffs' opposition (Doc. No. 56 ("Opp'n")), and Defendant's reply (Doc. No. 59 ("Reply")).

and text messages internationally over a data connection.

In 2012, NxtGn partnered with Telarix, Inc. ("Telarix") to develop a video platform capable of delivering "high definition video services" at "low fixed costs, and low per-minute billing rates." (Am. Compl. ¶ 10.) The platform – named "AVYDA Powered by Telarix" ("AVYDA") – used NxtGn technology to enable mobile devices to participate in high-definition videoconference calls. Specifically, AVYDA employed a "unique combination of networking hardware, signaling servers, and proprietary software" developed by NxtGn (the "NxtGn Proprietary Services"). (*Id.* ¶ 13.)

After Viber initiated contact with Next, the parties entered into a non-disclosure and confidentiality agreement (the "NDA") on June 22, 2012 to discuss whether Next could assist Viber in developing technology that would enable transmission of video calls over a wireless connection to mobile devices. (*Id.* ¶¶ 29-30.) The NDA prohibited the disclosure of proprietary information to third parties and restricted its use to the facilitation of a "possible business transaction between Viber and Next." (*Id.* ¶ 30.)

In May 2013, representatives of Next and Viber met at a trade show in Chicago, at which time Viber again expressed interest in Next's videoconferencing technology. (*Id.* ¶ 32.) On May 21, 2013, Telarix contacted Viber and sent an e-mail presentation, dated September 21, 2012, about AVYDA. (*Id.* ¶ 33.) On June 5, 2013, a Viber employee contacted Telarix, and, over the course of several meetings that month between representatives of Viber and Next, Next shared information about its technology and demonstrated its software to Viber. (*Id.* ¶¶ 34-36.) Next also shared with Viber its confidential business idea for a Celebrity Event Management platform ("CEM") (*id.* ¶ 37), which would enable "millions of simultaneous users to participate in an interactive videoconference with a celebrity from any device while choosing their own unique vantage point," thus "allow[ing] for a unique way to monetize a social media experience, namely by charging users on a per-minute basis for viewing a live, large-scale videoconference" (*id.* ¶ 87).

After the June 2013 meetings, the parties exchanged emails and presentations but never came to an agreement, as Viber indicated that it was interested in the NxtGn Proprietary Services, the NxtGn App, and CEM, but not in Telarix's services. (*Id.* ¶ 39.) On July 8, 2013, Viber asked Next to be the sole point of contact to develop a video solution. (*Id.* ¶ 40.) Subsequently, Viber ceased all communications with Next until January 2014, when a Viber representative arranged a meeting between Next's CEO, Arik Meimoun, and Viber's CEO. (*Id.* ¶ 42.)

On February 17, 2014, Japanese online retailer Rakuten, Inc. announced its intention to buy Viber for $900 million. (*Id.* ¶ 43.) Plaintiffs' Amended Complaint alleges that, at the time of acquisition, Viber did not have any videoconferencing abilities. (*Id.*)

In March 2014, Benny Shabtai, a large investor in Viber before it was sold, met with Meimoun and other Next representatives. At that meeting, Meimoun mentioned some of Next's capabilities, and Shabtai, who had not attended any of the 2013 meetings involving Next, Viber, and Telarix, described what he called an "unfinished feature" of Viber's app that Next alleges was a nearly verbatim

articulation of the confidential business idea that Next had previously shared with Viber. (*Id.* ¶ 48-49.)

In May 2014, Viber asked to meet with Telarix about a potential business transaction involving the use of the Telarix services that are part of AVYDA. (*Id.* ¶ 53.) Next alleges that Viber's renewed interest in Telarix "suggests that Viber is using the information it learned about the NxtGn Proprietary Services to develop its own advanced videoconferencing technology." (*Id.* ¶ 54.)

Finally, on November 18, 2014, Viber announced a new feature, "Public Chats," which Next alleges is "the first step toward Viber's implementation of Next's Celebrity Event Management Business Idea." (*Id.* ¶¶ 56-57.)

B.  Procedural History

On October 14, 2014, Plaintiffs filed the first complaint in this action. (Doc. No. 1.) On March 13, 2015, the Court denied Plaintiffs' request to file an amended complaint under seal, and directed Plaintiffs to file unredacted versions of the original Complaint, Amended Complaint, and all briefing, exhibits, and declarations. (Doc. No. 28.) On April 17, 2015, the Court denied Plaintiffs' motion for reconsideration of that Order. (Doc. No. 41.) Plaintiffs subsequently appealed the Order to the Second Circuit, but on July 14, 2015, the Second Circuit denied Plaintiffs' motion for a stay of the Court's Orders. (Doc. No. 52.) Plaintiffs eventually docketed their Amended Complaint on July 16, 2015. (Doc. No. 54.)

In the Amended Complaint, Plaintiffs assert four claims: (1) misappropriation of trade secrets; (2) misappropriation of a business idea; (3) breach of contract; and (4) unjust enrichment. (Doc. No. 54.) On July 20, 2015, Defendant filed an unredacted version of its motion to dismiss (Doc. No. 57), which was fully briefed on July 28, 2015.

II.  LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

III. DISCUSSION

A. Misappropriation of Trade Secrets

Given that both parties rely on New York law in their submissions, the Court applies New York law to Plaintiffs' claims. *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-cv-7908 (PAE), 2013 WL 2631043, at *2 (S.D.N.Y. June 11, 2013) ("Where "[t]he parties' briefs assume that New York law controls . . . such 'implied consent . . . is sufficient to establish choice of law.'" (quoting *Wolfson v. Bruno,* 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011))); *cf. Celle v. Filipino Reporter Enterp. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("Since no party has challenged the choice of New York . . . law, all are deemed to have consented to its application."). To succeed on a claim for the misappropriation of trade secrets under New York law, a party must show "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret [(3)] in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009).

As to the first element, a plaintiff must, "at minimum, generally identify the trade secrets at issue." *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, No. 14-cv-2796 (PKC), 2014 WL 4651942, at *5 (S.D.N.Y. Sept. 16, 2014). However, "specificity as to the precise trade secrets misappropriated is not required in order . . . to defeat . . . Motions to Dismiss." *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008); *see also SD Prot., Inc. v. Del Rio*, 498 F. Supp. 2d 576, 586 (E.D.N.Y. 2007) ("Naturally, [plaintiff] has no obligation to reveal those secrets in the Complaint simply to prove that they exist."). In other words, "a plaintiff only need give the opposing party fair notice of what the plaintiff's claim is and the grounds on which it rests." *Alexander Interactive, Inc.*, 2014 WL 4651942, at *4. Moreover, under New York law, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Integrated Cash Mgmt. Serv., Inc. v. Dig. Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (citation omitted); *see also* Restatement (First) of Torts § 757, cmt. b (Am. Law Inst. 1939) ("A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."). In sum, "New York and Second Circuit law establish that compilation trade secrets are protectable but . . . the law requires the trade secret claimant to *describe the secret with sufficient specificity* that its protectability can be assessed and to show that its compilation is unique." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05-cv-9292 (DLC), 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008) (emphasis added).

Plaintiffs' Amended Complaint describes in substantial detail the capabilities of the NxtGn Proprietary Services – which they allege are their trade secrets – without revealing the actual technical details. Specifically, Plaintiffs allege that the NxtGn Proprietary Services use a "unique technique for routing calls, allowing for detailed traffic monitoring, reporting, and billing." (Am. Compl. ¶ 19.) This technology, Plaintiffs allege, allows for a number of improvements in videoconferencing and networking, including the use of low-bandwidth

4

networks, the ability to scale the number of users to over a million, and the ability to charge end-users on a per-minute basis. (*Id.* ¶ 20.) Plaintiffs characterize their "trade secrets" as "the specific components used, the way these components fit together as building blocks to form a unique whole, and the process by which these components interact and work efficiently." (*Id.* ¶ 21.) Finally, Plaintiffs also allege that they provided Defendant with an "in-depth description of the NxtGn Proprietary Services, including the process by which [it] can be put to use to provide advanced videoconferencing technology. . . ." (*Id.* ¶ 36.) These descriptions are sufficient to survive a motion to dismiss because they enable the Court to generally define the trade secrets at issue. In essence, Plaintiffs are alleging that their trade secrets are the technologies they have invented to improve videoconferencing in specified ways.

Courts have previously found similar allegations sufficient to satisfy the first element of a misappropriation of trade secrets claim on a motion to dismiss. For example, in *Medtech Products Inc. v. Ranir, LLC*, Judge Karas found descriptions of trade secrets that included the "manufacturing cost details, drawings, test data, and other information about the design and manufacturing process for its dental protectors" sufficient to state a claim for misappropriation of trade secrets. 596 F. Supp. 2d at 789 (S.D.N.Y. 2008). Similarly, in *Sorias v. National Cellular USA, Inc.*, the court found it sufficient for a plaintiff to describe its trade secret as "data and designs of a specific phone charger with horizontally folding A/C prongs." No. 14-cv-2897 (WFK) (SMG), 2015 WL 5093344, at *13 (E.D.N.Y. Aug. 27, 2015); *see also E.J. Brooks Co. v. Cambridge Sec. Seals*, No. 12-cv-2937 (LAP), 2015 WL 9704079, at *9 (S.D.N.Y. Dec. 23, 2015) (finding description of trade secret as "manufacturing processes used to create" security seals sufficiently specific); *but see Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014) (dismissing plaintiff's complaint on summary judgment because descriptions of "varying structure compositions, a variety of different additives in differing concentrations, an enormous range of Entira amounts, and a wide variety of substrates and finishing treatment" were too generalized for the court to evaluate whether plaintiff did in fact have a trade secret), *aff'd*, 610 F. App'x 69 (2d Cir. 2015); *Sit-Up Ltd.*, 2008 WL 463884, at *9 (granting defendant summary judgment where plaintiff's complaint identified "more than one hundred individual trade secrets in varying degrees of specificity").

Here, as in *Medtech* and *Sorias*, Plaintiffs have offered descriptions of the technology they seek to protect that are sufficient for the Court to discern the general contours of the alleged trade secrets without compromising their secrecy and for Defendant to be put on notice of the claim. *See Sit-Up Ltd.*, 2008 WL 463884, at *10 ("[T]he law requires the trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed."). These descriptions suffice on a motion to dismiss. Accordingly while Plaintiffs' claim for misappropriation of trade secrets may eventually fail if discovery reveals that the technology which they seek to protect is not in fact unique, the Court finds that the Amended Complaint survives a motion to dismiss as to this first element.

As to the second element requiring use of the trade secret, the Restatement (Third) of Unfair Competition defines "use" of a trade secret to include "any exploitation of

5

the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant," including "marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret." Restatement (Third) of Unfair Competition § 40 cmt. c (Am. Law. Inst. 1995) (citation omitted); *see Advanced Analytics, Inc. v. Citigroup Glob. Mkts, Inc.*, No. 04-cv-3531 (LTS) (HBP), 2009 WL 7133660, at *17 (S.D.N.Y. Aug. 5, 2009) (adopting Restatement definition of "use"), *report and recommendation adopted in part, rejected in part*, No. 04-cv-3531 (LTS) (HBP), 2010 WL 4780772 (S.D.N.Y. Nov. 22, 2010). Here, Plaintiffs allege that "Viber misappropriated the NxtGn Proprietary Services to develop its own advanced videoconferencing technology like that found in the NxtGn App. Indeed, Next learned that this technology is currently an unfinished feature in the Viber App." (Am. Compl. ¶ 79.)

Thus, under the Restatement's broad definition of "use," Plaintiffs' allegation in the Amended Complaint that the Viber app has an unfinished feature using Plaintiffs' trade secrets is sufficient to allege "use" because an unfinished feature constitutes use of a trade secret in "manufacture or production." In addition, although Plaintiffs' allegations with respect to Defendant's use of their trade secrets are based on second-hand knowledge from Shabtai, the Viber investor (*see* Am. Comp. ¶ 49), this Circuit has generally found that "allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Boykin v. KeyCorp,* 521 F.3d 202, 215 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also Lindner v. Int'l Bus. Machs. Corp.*, 06-cv-4751 (RJS), 2008 WL 2461934, at *16-17 (S.D.N.Y. June 18, 2008) (accepting allegations based on "information and belief," especially with respect to information "peculiarly within the opposing party's knowledge"). At this stage, without discovery, it is to be expected that Plaintiffs would have limited knowledge of the extent to which Defendant has used their trade secrets. Accordingly, the Court finds that Plaintiffs have sufficiently alleged the second element of their misappropriation of trade secrets claim – that Defendant used their trade secrets in developing a feature for its own app.

Finally, as noted below with respect to the breach of contract claim, Plaintiffs have sufficiently alleged a breach of the NDA, which was an agreement between the two parties – thus satisfying the third element that use of the trade secrets be "in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transp.*, 559 F.3d at 117.

Accordingly, because Plaintiffs have described their trade secrets with sufficient specificity and alleged that Defendant used these trade secrets in breach of the NDA, the Court denies Defendant's motion to dismiss Count II of Plaintiffs' Amended Complaint.

B.  Misappropriation of a Business Idea

To plead a claim of misappropriation of a business idea under New York law, a plaintiff must show "the requisite legal relationship . . . between the parties" based on "an express contract, an implied-in-fact contract, or a quasi-contract," and an "idea" that is "novel and concrete." *McGhan v. Ebersol*, 608 F. Supp. 277, 284 (S.D.N.Y. 1985). Generally, "[t]he test for novelty is rather stringent [and] the idea must show true invention and not a mere adaptation of

6

existing knowledge." *Broughel v. Battery Conservancy*, No. 07-cv-7755 (GBD), 2010 WL 1028171, at *4 (S.D.N.Y. Mar. 16, 2010); *see also Vent v. Mars Snackfood US, LLC*, 611 F. Supp. 2d 333, 338 (S.D.N.Y. 2009) ("An idea that is an adaptation of an existing idea or that embodies elements long in use may be novel if the adaptation or combination would lead to a significantly new and useful result." (brackets and internal quotation marks omitted)), *aff'd*, 350 F. App'x 533 (2d Cir. 2009). On a motion to dismiss, a court may find that an idea is not novel if it is "simply a variation on a theme that already existed." *Zikakis v. Staubach Retail Servs., Inc.*, No. 04-cv-9609 (NRB), 2005 WL 2347852, at *3 (S.D.N.Y. Sept. 26, 2005); *see also Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 321 (Sup. Ct. 2011) ("[T]his issue may be determined on a motion to dismiss, provided that the documentary evidence conclusively establishes lack of novelty as a matter of law.").

As an initial matter, the NDA establishes the necessary legal relationship between Plaintiffs and Defendant. Nevertheless, Defendant argues that Plaintiffs have insufficiently alleged that the NDA was operative at the time of the alleged misappropriation of a business idea because the paragraph in the Amended Complaint that refers to the sharing of the CEM idea does not include a date and merely states that "Next also shared its confidential Celebrity Event Management business idea." (Am. Compl. ¶ 37.) In essence, Defendant asks the Court to infer that the sharing took place after the NDA expired on June 22, 2013. (*Id.*, Ex.1, ¶ 7.) However, the more plausible inference is that Plaintiffs told Defendant about the CEM idea at the same time that they shared other information, presumably in the June 11 and June 13, 2013 discussions that are described in the two paragraphs immediately preceding Plaintiffs' statement about the CEM idea. (*See id.* ¶¶ 35-36.) Considering Plaintiffs' allegation about the sharing of the CEM idea in the context of the paragraphs that immediately precede it, the Court finds that Plaintiffs have sufficiently alleged the existence of a contract and that the issue of whether or not any alleged misappropriation took place while that contract was still operative is a question of fact that may not be resolved on a motion to dismiss.

However, Plaintiffs have failed to satisfy the second element of their misappropriation of a business idea claim because they have not sufficiently alleged that the CEM idea is "a true invention and not a mere adaptation of existing knowledge." *Broughel*, 2010 WL 1028171, at *4. Plaintiffs allege that "[t]here is nothing currently on the market that allows for millions of simultaneous users to participate in an interactive videoconference with a celebrity from any device while choosing their own unique vantage point" and that this "allows for a unique way to monetize a social media experience, namely by charging users on a per-minute basis for viewing a live, large-scale videoconference." (*Id.* ¶ 87.) However, these allegations, when compared with documents available in the public domain, are insufficient to establish that the CEM idea is novel. *See Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 692 (N.Y. App. Div. 2015) ("As with the trade secret claim, the idea misappropriation claim cannot extend to material in the public domain." (citation omitted)).

Specifically, Defendant identifies a number of patent applications that pre-date the events in the Amended Complaint for inventions closely resembling Plaintiffs' CEM idea. Significantly, these publicly filed applications – of which the Court may

7

take judicial notice, *see Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 287 n.3 (S.D.N.Y. 2010) ("The Court may properly take judicial notice of official records of the United States Patent and Trademark Office and the United States Copyright Office.") – include a 2007 patent for a "method for providing multiple viewing opportunities of events [which] . . . may be communicated . . . over a cellular network" (Doc. No. 37, Declaration of Susan M. Schlesinger, dated April 20, 2015 ("Schlesinger Decl."), Ex. D), a 2011 patent for "establishing, via a mobile device, a plurality of media streaming sessions with a respective plurality of source devices" (*id.*, Ex. E), and a 2006 patent for a "plurality of digital video streams [that] enable an attendee of the live concert to select which of the plurality of digital video streams to view using a portable digital device . . . such that the attendee may choose from among the different views of the live concert" (*id.*, Ex. G). Plaintiffs attempt to distinguish their idea from these applications by emphasizing that CEM would allow the broadcast of an event to "***millions*** of simultaneous fans over their mobile devices." (Opp'n at 13 (emphasis in original).) However, the mere use of bold and italics cannot hide the fact that the idea alleged by Plaintiffs is virtually indistinguishable from those described in the patent applications, and therefore is not novel: indeed, it seems likely that *anything* broadcast over a cellular network has the potential to reach millions of viewers. At most, Plaintiffs' idea is "simply a variation on a theme that already existed," as demonstrated by these existing patent applications. *Zikakis*, *Inc.*, 2005 WL 2347852, at *3. Plaintiffs' own description of the CEM idea seems to recognize that the idea is not novel, as they describe it as "similar to major social services, but using live HD video instead of short text messages or images." (Am. Compl. ¶ 37.)

In short, the Court finds that Plaintiffs have not alleged that the CEM idea satisfies the "stringent" standard for novelty in a misappropriation of a business idea claim, since  publicly filed applications for patents reveal similar ideas which Plaintiffs are incapable of distinguishing. *Broughel*, 2010 WL 1028171, at *4. Accordingly, the Court finds that Plaintiffs have failed to state a claim for misappropriation of a business idea and Count III of the Amended Complaint must be dismissed.

### C.  Breach of Contract

The elements of breach of contract are: "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) non-performance by the other party; and (4) damages attributable to the breach." *RCN Telecom Servs., Inc. v. 202 Centre St. Realty LLC*, 156 F. App'x 349, 350-51 (2d Cir. 2005).  In determining a party's obligations under a contract, "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (internal quotation marks and citation omitted). "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).  Only "if a contract is unambiguous on its face" may a court construe it as a matter of law. *Metro. Life Ins. Co. v. RJR Nabisco Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). Moreover, a contract is unambiguous if it "has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.*

(brackets and internal quotation marks omitted). Although the court is "not constrained to accept the allegations of the complaint in respect of the construction of the Agreement," it must "strive to resolve any contractual ambiguities in [plaintiff's] favor." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

With respect to their breach of contract claim, Plaintiffs cite to the NDA – which is attached to the Complaint and thus may be considered by the Court on a motion to dismiss, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) – to allege that Defendant has breached the contract in two ways: (1) by "using the Proprietary Information . . . to develop its own advanced videoconferencing technology," and (2) by "sharing the Proprietary Information with Rakuten." (Am. Compl. ¶¶ 67-68.)

As to the first alleged breach, Defendant argues that Plaintiffs' allegations that the proprietary information is part of "an *unfinished feature* in the Viber App" is inadequate to allege use in violation of the NDA. (*Id.* ¶ 67.) However, the express language of the NDA provides that the party receiving the information may "[u]se the Proprietary Information provided hereunder only for the purposes directly related to the purpose expressed herein above and for no other purposes." (*Id.*, Ex. 1 at 2.) In addition, the NDA defines its purpose as "assessing possible business transactions between the Parties." (*Id.*, Ex. 1 at 1.) Based on these definitions, and construing any ambiguities in the NDA in favor of Plaintiffs, Defendant's alleged use of the information provided by Plaintiffs to develop a feature in its own app would contravene the NDA's requirement that the shared information may only be used to facilitate business transactions between the parties. Thus, under the language of the NDA, the simple fact that Defendant might have used the information in its own research and development of videoconferencing technology is sufficient to allege a breach of the contract.

As to the second alleged breach, Defendant argues that Plaintiffs' Amended Complaint does not sufficiently plead that the allegedly shared information, the CEM idea (Am. Compl. ¶ 49), was Proprietary Information – as it is defined in the NDA – because it was available in the public applications for patents. This argument, which is essentially an affirmative defense, is inappropriate on a motion to dismiss. Specifically, the NDA prohibits the sharing of "Proprietary Information" that is "not generally available to the public and which [Plaintiffs] designate[d] as such." (*Id.*, Ex. 1 at 1.) On a motion to dismiss, the Court must accept as true Plaintiffs' allegation that Defendant "shar[ed] the Proprietary Information with Rakuten" (*id.* ¶ 68), and it cannot answer the factual question of whether the CEM idea was "Proprietary Information" as that term is defined under the contract (*id.*, Ex. 1 at 1). Defendant once again relies on the publicly filed patent applications to argue that the CEM idea was not covered by the NDA. However, although the applications are relevant to show that the CEM idea does not satisfy the stringent novelty standard for Plaintiffs' misappropriation claim, they do not impact the Court's interpretation of the terms of the NDA, nor do they enable the Court to evaluate whether the CEM idea was "Proprietary Information," as defined in the NDA. In other words, while the patent applications demonstrate that the CEM idea is a variation of ideas in the public domain, they do not compel the conclusion that the CEM idea itself is not "Proprietary Information" under the terms of the contract.

9

At this stage of the litigation, the Court cannot conclude, as a matter of law, that the sharing of the CEM idea was *not* a violation of the NDA. Accordingly, the Court finds that Plaintiffs have sufficiently alleged two potential breaches of the NDA through their allegations of both the use and sharing of information protected by the NDA.

Finally, the Court finds that Plaintiffs' allegations with respect to damages are also sufficient. Although the Amended Complaint does not specify a dollar amount of damages for the breach of contract claim, it does provide factual support for Plaintiffs' claim that Defendant harmed them. Specifically, Plaintiffs allege that "being the first competitor in an emerging market is a business advantage of immeasurable value" (*id.* ¶ 70), and seek both "permanent injunctive relief to prevent Viber from using and further disseminating Next's Proprietary Information" and damages "cause[d] [by] Viber's breach of the NDA" (*id.* ¶ 71). These allegations are sufficient to plead damages for the purposes of a motion to dismiss because it is plausible that the loss of the competitive advantage caused harm to Plaintiffs. *See, e.g.*, *Xcellence, Inc. v. Arkin Kaplan Rice LLP*, No. 10-cv-3304 (HB), 2011 WL 1002419, at *5 (S.D.N.Y. Mar. 15, 2011) ("General pleading that [plaintiff] suffered damages is sufficient to withstand a motion to dismiss."); *see also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 611 (S.D.N.Y. 2009) ("[D]amages issues are not properly resolved at the motion to dismiss stage.").

Accordingly, because the Court finds that Plaintiffs' Amended Complaint includes factual allegations which, taken together, satisfy the four elements of breach of contract, Defendant's motion to dismiss Count I of the Amended Complaint is denied.

### D. Unjust Enrichment

To state a claim for unjust enrichment under New York law, a plaintiff must plead that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011) (citation omitted). However, "when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in . . . unjust enrichment . . . are generally precluded, unless based on a duty independent of the contract." *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011). Nonetheless, a claim for unjust enrichment may still proceed "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue." *Id.* (internal quotation marks omitted).

Here, as discussed above, the parties dispute whether the alleged use and sharing of information was covered by the NDA. As such, Plaintiffs may proceed on their unjust enrichment claim in the event that, at a later stage of litigation, the NDA is found not to cover the disputes in this case. *See id.* Although Plaintiffs can ultimately recover on only one of their two claims for breach of contract and unjust enrichment, courts in this district have routinely allowed plaintiffs to advance past the pleading stage on an alternate theory of unjust enrichment. *See, e.g.*, *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 452-53 (S.D.N.Y. 2014) (collecting cases); *Maalouf v. Salomon Smith Barney, Inc.,* No. 02-cv-4770 (SAS), 2003 WL 1858153, at *7 (S.D.N.Y. Apr. 10, 2003) (finding that plaintiff may plead both contract and quasi-

10

contract claims); *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 466 (S.D.N.Y. 2003) (holding that dispute over validity of contract permits plaintiff to proceed in the alternative on unjust enrichment claim). Accordingly, the Court finds that, at least for the moment, Plaintiffs may proceed on their claim for unjust enrichment and denies Defendant's motion to dismiss Count IV of the Amended Complaint.

### IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT Defendant's motion to dismiss is GRANTED on Plaintiffs' misappropriation of a business idea claim, but DENIED as to their misappropriation of trade secrets, breach of contract, and unjust enrichment claims. IT IS FURTHER ORDERED THAT the parties shall appear on April 29, 2016 at 10:30 a.m. for a post-discovery conference. As referenced in the case management plan and scheduling order (Doc. No. 22), any party wishing to make a post-discovery motion shall submit a pre-motion letter by April 15, 2016; the non-moving party shall respond within three business days. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 34.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 30, 2016
      New York, New York

\* \* \*

Plaintiffs are represented by Carlos Nunes-Vivas and Daniel Foodman of Wnf Law, P.L., 1111 Brickell Avenue, Suite 2200, Miami, FL 33131, and Neil Postrygacz of Neil L. Postrygacz, Attorney at Law PC, 419 Lafayette Street, New York, NY 10003.

Defendant is represented by Jeffrey Weingart, Jeffrey Kimmel, and Susan Schlesinger of Meister Seelig & Fein LLP, 125 Park Avenue, 7th Fl., New York, NY 10017.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-30-16

11