UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

No. 14-cv-8190 (RJS)

NEXT COMMUNICATIONS, INC. *AND* NXTGN, INC.,

Plaintiffs,

-v-

VIBER MEDIA, INC.,

Defendant.

OPINION AND ORDER
September 30, 2017

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/30/17

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Next Communications, Inc. and NxtGn, Inc. (collectively, "Next") bring this action against Defendant Viber Media, Inc. ("Viber"), alleging breach of contract, misappropriation of trade secrets, and unjust enrichment. Now before the Court are Viber's motions for (1) summary judgment on all claims, (2) sanctions, and (3) attorneys' fees and costs. For the reasons set forth below, Viber's motion for summary judgment is granted, and its motions for sanctions and fees are denied.

I. BACKGROUND

A. Facts

This case concerns videoconferencing technology that Viber allegedly stole from Next.[1] In 2012 and 2013, Next, a provider of long-distance data services for telecommunications carriers, developed three platforms designed to improve mobile

---

[1] The following facts are generally taken from Defendant's Local Civil Rule 56.1 Statement (Doc. No. 113 ("Def. 56.1")), Plaintiffs' Counterstatement (Doc. No. 141 ("Pl. 56.1")), the declarations submitted in support of and in opposition to Defendant's motion for summary judgment, and the exhibits attached thereto (Doc. Nos. 114–115, 137–138, 145–146). Unless otherwise noted, where one party's 56.1 Statement or Counterstatement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In deciding Defendant's motions, the Court has also considered Defendant's memorandum of law (Doc. No. 112 ("Def. Mem.")), Plaintiffs' memorandum of law in opposition (Doc. No. 140 ("Pl. Mem.")), and Defendant's reply in further support of its motions (Doc. No. 144 ("Def. Reply")).

videoconferencing: (1) NxtGn Proprietary Services, an allegedly "unique combination of networking hardware, signaling servers, and proprietary software" that enables mobile devices to participate in high-definition videoconference calls; (2) the NxtGen App, which allegedly "uses a proprietary process to scale individual routers, which allows millions of people to connect simultaneously to the same videoconferencing feed"; and (3) the Celebrity Event Management business idea, which envisioned "millions of simultaneous users . . . participat[ing] in an interactive videoconference with a celebrity from any device." (Doc. No. 67, Amended Complaint ("Am. Compl.") ¶¶ 10, 13, 17, 87.)

Next and Viber, the maker of a widely used mobile VoIP app, both attended a trade show in May of 2012, at which Viber employee Arie Frenklakh spoke with Next CEO Arik Maimon about Next's videoconferencing technology. (Doc. No. 138 ("Maimon Decl.") ¶¶ 5–7.) A month later, Next and Viber entered into a Nondisclosure and Confidentiality Agreement ("NDA") "in order to facilitate a possible business transaction." (Def. 56.1 ¶¶ 9–10; Maimon Decl. ¶ 9.) The NDA prohibited the disclosure of proprietary information to third parties and defined "proprietary information" to mean information designated as proprietary by the disclosing party and not generally known to the public. (Def. 56.1 ¶ 14.)

In November of 2012, Frenklakh visited Next's Miami offices to learn more about Next's videoconferencing solutions. (Maimon Decl. ¶¶ 11.) After a meeting with Next's engineering team, Maimon gave Frenklakh hard copies of two PowerPoint presentations, titled "Technology Offerings – NxtGn – 2012" and "NxtGn HD Video Cloud Platform." (*Id.* ¶ 13.) Maimon and Frenklakh met again at another trade show in May 2013, where Maimon gave Frenklakh a hard copy of a third PowerPoint presentation titled "NxtGn HD Video Cloud Platform (2013)." (*Id.* ¶¶ 14–15.) A month later, Maimon gave Frenklakh a demonstration of the still-unfinished NxtGen App. (*Id.* ¶ 19.) Maimon and Frenklakh also participated in a June 13, 2013 conference call with several representatives from Next, Viber, and Telarix, one of Next's technology partners, to discuss Next's and Telarix's videoconferencing solutions. (*Id.* ¶¶ 20–22.) According to Maimon, Viber's representatives seemed more interested in Next's NxtGn Proprietary Services than in Telarix's solution. (*Id.* ¶ 22.) Shortly after this meeting, however, Viber stopped communicating with Next for about seven months. (*Id.* ¶ 26.)

In January of 2014, Frenklakh and Maimon met again in Miami. (*Id.* ¶ 27.) A month later, Maimon learned that Viber had been acquired by Rakuten, Inc., a Japanese online retailer. (*Id.* ¶ 28.) Shortly after the acquisition, Maimon had lunch with a Viber shareholder, who described "an unfinished feature in Viber's app" that Maimon thought sounded "nearly identical to a presentation [he] had given to Viber regarding NxtGn [Proprietary Services'] videoconferencing capabilities" and was "subject to [the parties'] NDA." (*Id.* ¶¶ 29–30, 32.)

B. Procedural History

Next commenced this action on October 14, 2014, alleging that Viber was "using the information it learned about the NxtGn Proprietary Services to develop its own advanced videoconferencing technology," and that Viber had taken a step toward implementing its own version of Next's Celebrity Event Management business idea. (Am. Compl. ¶¶ 54, 56–57.) More

specifically, Next's Amended Complaint asserted four claims: (1) misappropriation of trade secrets; (2) misappropriation of a business idea; (3) breach of contract; and (4) unjust enrichment. (Doc. No. 54.) On March 30, 2016, the Court granted Viber's motion to dismiss with respect to the claim for misappropriation of a business idea but denied it with respect to the other three claims. (Doc. No. 72.) The Court then issued a scheduling order requiring the parties to participate in "Phase I" of discovery, during which Next had to produce to Viber "all materials and information [that it alleged] (i) were disclosed and/or provided to Viber, and (ii) contain and/or constitute trade secrets or confidential information of [Next], including, without limitation, the alleged Proprietary Information, the NxtGn Proprietary Technology, the NxtGn App, and the Celebrity Event Management business idea." (Doc. No. 87 ¶ 9.) The order added, "[Next] shall identify *with particularity* in writing to Viber which parts, if any, of the Phase I Production constitute Proprietary Information or trade secrets." (*Id.* ¶ 10 (emphasis added).)

On June 30, 2016, Next completed its Phase I production, which consisted of email correspondence, several PowerPoint slide decks, and declarations from Maimon and Next technical advisor Vitaliy Yurchenko. (Def. 56.1 ¶¶ 5–6, 16.) Pursuant to the scheduling order, Viber then deposed Next's Rule 30(b)(6) witness, Michael De Prado, the company's President and Chief Operating Officer. (*Id.* ¶ 5; Doc. No. 114-2 at 5 ("De Prado Tr.")) At his deposition, De Prado identified the particular pages of the Phase I production that Next alleges contain or constitute trade secrets or proprietary information within the meaning of the NDA. (Def. 56.1 ¶ 17.) Specifically, De Prado "identified the [s]lide [d]ecks and the Yurchenko Declaration as the only pages of [Next's] Phase I Production [that Next] contend[s] contain [p]roprietary [i]nformation or trade secrets." (*Id.* ¶ 45.)[2]

Phase I discovery closed on August 23, 2016, and on October 11, 2016, Viber moved for summary judgment on the ground that the materials contained in Next's Phase I production did not include any trade secrets or proprietary information within the meaning of the parties' NDA. (Doc. No. 111.) After Next's counsel withdrew on November 28, 2016, the Court granted Next an extension of time until February 6, 2017 to retain new counsel and submit its opposition. (Doc. Nos. 126, 129, 132.) The motion was fully submitted on February 16, 2017. (Doc. No. 144.)

II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are

---

[2] The slide decks De Prado identified include (1) a PowerPoint presentation marked "Telarix Proprietary and Confidential," (2) a PowerPoint presentation titled "NxtGn: Elegant, efficient Telecommunications Platforms for PTTs, Telcos, Network Operators, and Enterprises," which has a confidentiality marking on only one page, (3) a PowerPoint presentation titled "2012 NxtGn Technology Offerings" (marked "highly confidential"), and (4) a PowerPoint presentation titled "NxtGn HD Video Cloud Platform (2013)." (*Id.* ¶ 53.)

3

no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

III. DISCUSSION

Viber now moves for summary judgment on each of Next's three causes of action – misappropriation of trade secrets, breach of contract, and unjust enrichment – as well as for sanctions and attorney's fees.

A. Misappropriation of Trade Secrets

To succeed on a claim for misappropriation of trade secrets under New York law,[3] a party must show "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (citation omitted). The parties' dispute here focuses almost entirely on the first element, whether Next possessed a trade secret.

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* (citation omitted). Under New York law, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique

---

[3] Since both parties rely on New York law in their briefs, and since the NDA contains a New York choice-of-law provision, the Court applies New York law to Next's claims. *See Krumme v. West Point*, 238 F.3d 133, 138 (2d Cir. 2000); *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-cv-7908 (PAE), 2013 WL 2631043, at *2 (S.D.N.Y. June 11, 2013) ("Where '[t]he parties' briefs assume that New York law controls . . . such 'implied consent . . . is sufficient to establish choice of law.'" (quoting *Wolfson v. Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011))).

4

combination, affords a competitive advantage and is a protectable secret." *Integrated Cash Mgmt. Serv., Inc. v. Dig. Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (citation omitted). A trade secret claimant must, however, "describe the secret with sufficient specificity that its protectability can be assessed and to show that its compilation is unique." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05-cv-9292 (DLC), 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008); *see Heyman v. AR. Winarick, Inc.,* 325 F.2d 584, 590 (2d Cir. 1963). In addition, New York courts have approvingly cited the First Restatement's list of suggested factors to help determine whether information constitutes a trade secret, *e.g.*, *id*., which includes:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (First) of Torts § 757, cmt b; *see also Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) ("There is no generally accepted definition of a trade secret[,] but that found in section 757 of Restatement of Torts, comment *b* has been cited with approval by this and other courts.") The first factor, of course, is crucial: "the most important consideration [is] whether the information was secret." *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986).

Having considered the materials produced in Phase I of discovery, the Court finds that Viber is entitled to judgment as a matter of law on Next's first cause of action, since Next has failed both to *identify* its alleged trade secrets with sufficient specificity and to adduce adequate evidence that its information was in fact secret.

First, Next must demonstrate with particularity the trade secrets that it allegedly disclosed to Viber. At the pleading stage, "specificity as to the precise trade secrets misappropriated is not required." *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008). In order to survive summary judgment, however, the plaintiff must describe the secrets with greater precision; "vague and indefinite" illustrations will not suffice. *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co*., 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014) (citing *Heyman*, 325 F.2d at 588–90); *Sit-Up*, 2008 WL 463884, at *9–10. Although Next's general descriptions of its alleged secrets were enough to survive a motion to dismiss, the purpose of Phase I discovery in this case was for Next to identify those secrets more specifically. (*See* Doc. No. 87 ¶¶ 9–10.)

As an initial matter, Next seems not to have been entirely consistent in how it has characterized its putative secrets. At the motion-to-dismiss stage, Next identified NxtGn Proprietary Services, the NxtGen App, and Celebrity Event Management as the bases for its trade-secret claim. During Phase I of discovery, however, Next identified its putative secrets as the "GSM-IP Mobile Network," "Secure Financial Network," and "HD Video Cloud Architecture" – as reflected in three slide

decks: "2012 NxtGn Technology Offerings," "NxtGn HD Video Cloud," and "NxtGn HD Video Cloud 2013." (Def. 56.1 ¶¶ 17, 18, 19, 42, 45, 47; Pl. 56.1 ¶¶ 18, 19, 42, 45, 47, 58; Maimon Decl. ¶ 4; Doc. No. 114-6 ("Yurchenko Decl.")). In its response to Viber's statement of material facts, Next concedes that the GSM-IP Mobile Network and the Secure Financial Network are components that Next identified as trade secrets for the first time during Phase I discovery. (Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42.) But none of the three components are named in Next's Amended Complaint. Nor does the complaint reveal the titles of the supposedly crucial slide presentations that, Next now alleges, contain Next's trade secrets and proprietary information. The complaint *does* allege that Next's partner, Telarix, sent Viber two presentations that contained Next's confidential information, but whether those presentations contained the slides now at issue is unclear. Thus, Next appears to have presented Viber with a moving target.

To make matters worse, Next's Phase I discovery materials offer little clarification about how the GSM-IP Mobile Network, Secure Financial Network, and HD Video Cloud Architecture, alone or in combination, constitute trade secrets. To begin with, the slide decks themselves merely consist of vague descriptions and rudimentary graphics and concepts; they neither describe trade secrets with particularity nor explain how various components fit together to form compilation trade secrets. Perhaps recognizing this problem, Next also provided an affidavit from its technical advisor, Yurchenko, which purports to interpret the information in the slides. But those interpretations are hardly illuminating. For example, according to Yurchenko, the GSM-IP Mobile Network (allegedly depicted in two cartoonish diagrams on pages 14 and 15 of "2012 NxtGn Technology Offerings") is "designed in a way that software-defined radio controls sending/receiving electronics in [Base Transceiver System] and all other functions are done via [Session Initiation Protocol] infrastructure," which "reduces cost . . . while preserving all expected functions." (Yurchenko Decl. ¶ 6.) But Yurchenko fails to identify what specific aspects of this design are supposedly unique, valuable, and secret. *See Sit-Up*, 2008 WL 463884, at *10. Meanwhile, Viber has produced undisputed evidence that the diagram on page 14 of the presentation is "virtually identical" to a diagram that is publicly available online from a third party, Range Networks, Inc., in a user manual bearing a 2011 copyright designation. (*See* Def. 56.1 ¶ 62; Doc. No. 114-1) As already established, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Integrated Cash Mgmt.*, 920 F.2d at 174. But it is equally clear that "information that is public knowledge or that is generally known in an industry cannot be a trade secret," including information that is available in publications. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (internal citation omitted); *Speedry Chem. Prod., Inc. v. Carter's Ink* Co., 306 F.2d 328, 331 (2d Cir. 1962) ("Matters of . . . general knowledge in an industry cannot be appropriated by one as his secret." (internal citation omitted)). Significantly, Yurchenko does not explain how, if at all, the diagrams on pages 14 and 15 combine to form a trade secret. This failure is fatal, since "New York and Second Circuit law establish that compilation trade secrets are protectable but . . . the law requires the trade secret claimant

6

to describe the secret with sufficient specificity that its protectability can be assessed and to show that its compilation is unique.'' *Sit–Up*, 2008 WL 463884, at *10.

As for the Secure Financial Network and HD Video Cloud Architecture, Yurchenko's descriptions are similarly unilluminating. Regarding the Secure Financial Network, for instance, Yurchenko states that "[e]ncapsulation of multiple encryptions, one inside of another, creates unique type [sic] of secure networks, which insures the security of financial transitions." (Yurchenko Decl. ¶ 12.) But that general description does not reveal how the encryptions are encapsulated, what elements of that process (if any) are secret or proprietary, or how those elements "in unique combination, afford[] a competitive advantage." *Integrated Cash Mgmt.*, 920 F.2d at 174; *see BondPro Corp. v. Siemens Power Gen., Inc.,* 463 F.3d 702, 710 (7th Cir. 2006) ("One expects a trade secret to be rich in detail, because a process described in general terms [...] will usually be widely known and thus not worth incurring costs to try to conceal and so not a trade secret."). Regarding the HD Video Cloud Architecture, Yurchenko describes a "video router" that "produces several types of audio or video streams, rather than a single one, alleviating congestion." (Yurchenko Decl. ¶ 16). But again, Yurchenko does not explain how the video router does this, or what aspects of that process, if any, are unique and therefore protectable. And finally, Yurchenko offers no hint of how, if at all, the GSM-IP Mobile Network, Secure Financial Network, and HD Video Cloud Architecture function together as a unique, competitively advantageous compilation.

Furthermore, even if Yurchenko had described Next's alleged secrets with adequate specificity, Next has not shown what protected materials were disclosed to Viber during the relevant time period. Logically, to make out a claim for the misappropriation of a trade secret, a plaintiff must show not only that it possessed a secret but that the secret was misappropriated. *See Faiveley Transp. Malmo AB*, 559 F.3d at 116–17. That requires identifying "the route through which [the alleged secret] was provided to the defendants." *Sit-Up*, 2008 WL 463884, at *8. Here, Next does not contend that its alleged secrets were readily ascertainable from the slides themselves, which consist only of elementary diagrams and barebones descriptions. (*See, e.g.*, Doc. No. 114-12.) And Next concedes that Yurchenko himself never had direct communication or contact with Viber. (Def. 56.1 ¶ 26.) Yurchenko's Declaration purports to "detail the information found" in the slide presentations, but does not represent that he gave that information to Viber. (Yurchenko Decl. ¶ 3.) According to De Prado, Yurchenko did not speak Hebrew, so Next's primary liaisons to Viber were two Hebrew-speaking technologists, Ariel Dayan and Yitzhak Greenberg. (Def. 56.1 ¶¶ 26—27.) In his deposition, De Prado ultimately conceded that he had no direct knowledge of what Yurchenko said to Greenberg and Dayan, or what they in turn told Viber, because De Prado never participated in those conversations. (*See id.* ¶ 25.) Thus, although De Prado testified that the "ideas and abstracts" referenced in the Yurchenko Declaration were conveyed to Viber (De Prado Tr. at 147), that appears to be mere speculation.

Obscuring matters even further, Next's opposition brief reflects yet another evolution in Next's trade-secret claim. There, Next makes only a passing reference to Yurchenko and instead zeroes in on a single, allegedly "crucial slide" that supposedly demonstrates Next's "secret

7

recipe" for "teleconferencing with upwards of 10,000 individuals . . . with the ability to monetize[.]" (Pl. Opp'n at 6 (citing Doc. No. 114-12 at 30).) The slide itself, however, merely depicts a simplistic diagram illustrating connections between various telecommunications devices. Relying on another post-hoc exegesis, this time from expert Roger Marks, Next conclusorily asserts that this slide contains a "unique blueprint" for a concept allegedly "so novel no one else has previously been capable of performing [sic]." (Pl. Opp'n at 7.) According to Next, this network design is unique because it uses a "completely different module (video router), but utilizes [it] in a way not traditionally applied or known to be applied previously." (*Id.*) But Next does not specify what that "way" is or how that "way" can be ascertained from the generic graphics on the slides.

Next also briefly discusses another slide, which supposedly depicts a "novel and distinctive business model associated with the telecommunications system." (*Id.* at 8.) To support that claim, Next relies solely on the following quotation from Marks:

> This slides [sic] . . . indicate [sic] that Payments and Accounting SVC are part of the Accounting and CDR Service Clusters, which includes "CDRs." In the telecommunication industry, "CDR" is understood to mean "Call Detail Record, which is a record of a service event typically used as the basis of billing. The generation of CDRs is essential to the development of traditional pre-paid and post-paid billing services. Thus, the technical capability to generate CDRs underlies various opportunities to monetize the network capabilities. I believe that this focus on service accounting and billing indicates an approach that is not a typical [sic] in the videoconference and video delivery business. Some providers use other models; for example, I earlier referenced information indicating that the Vidyo business is or was based on charges for hardware and for an annual per-line access license.

(Pl. Opp'n at 8.) But the slide, which consists merely of an array of icons clustered in blue and yellow boxes, neither demonstrates how Next generates "Call Detail Records" nor how Next uses CDRs to monetize its videoconferencing products. And obviously, Marks's "belief" that Next's focus on accounting and billing is "not typical" because "some providers use other models" is hardly evidence of a trade secret – that is, a unique formula generally unknown in the industry, *Big Vision*, 1 F. Supp. 3d at 259 – much less one that was actually conveyed to Viber.

In sum, after more than two years of litigation, including several months of Phase I discovery in which the Court ordered Next to define its alleged trade secrets with the required particularity (Doc. No. 87), Next still has not done so. The contours of Next's alleged secrets, and the means by which they were supposedly conveyed to Viber, remain "vague and indefinite." *Big Vision*, 1 F. Supp. 3d at 270. Meanwhile, as Viber justifiably complains, the Court and the parties have been forced to play a game of trade-secret "whack-a-mole." (Def. Mem. at 24); *see Big Vision*, 1 F. Supp. 3d at 263 ("It does not require a [science] degree to realize that the putative trade secret has differed meaningfully and materially throughout the litigation.") Next offers no reason why that game should continue – only more evasion and obfuscation. Thus, Viber is entitled to

8

summary judgment on Next's trade-secret misappropriation claim.

## B. Breach of Contract

Next brings a similar claim against Viber on a breach-of-contract theory. The elements of breach of contract are: "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *RCN Telecom Servs., Inc. v. 202 Centre St. Realty LLC*, 156 F. App'x 349, 350–51 (2d Cir. 2005) (citation omitted). "Because [Next] must prove each of these elements, the absence of a genuine issue of material fact" as to whether Next has established "any one of them will require an award of summary judgment in favor of [Viber.]" *Marks v. N.Y. Univ.*, 61 F. Supp. 2d 81, 88–89 (S.D.N.Y. 1999).

Here, the contract at issue is the Non-Disclosure Agreement, which purports to govern the exchange of "Proprietary Information" between Next and Viber. (*See* Doc. No. 67-1 at 2.) "Proprietary Information" is defined as "that Information which the Party disclosing such Information (hereinafter the "Disclosing Party") desires to protect against unrestricted disclosure or competitive use, which is not generally available to the public and which the Disclosing Party designates as such." (Doc. No. 54-1 at 1.) Under the terms of the NDA, Viber was authorized to "[u]se the Proprietary Information . . . only for the purposes directly related to the purpose expressed herein above and for no other purposes." (*Id.* at 2.) The NDA defines its purpose as "assessing possible business transactions between the Parties." (*Id.* at 1.) Thus, as relevant here, the NDA prohibited Viber from disclosing to third parties, or using in its own business, any publicly unavailable information that Next designated as proprietary.

The parties do not dispute that the NDA is a valid contract, so the only question is whether Viber violated its terms. In its complaint, Next alleged that Viber breached the NDA in two ways. First, Next alleged, Viber "used the Proprietary Information to develop its own advanced videoconferencing technology like that found in the NxtGn App." Second, Viber allegedly "shar[ed] the Proprietary Information with Rakuten before Rakuten acquired Viber." (Am. Comp. ¶¶ 67-68.)

As with Next's putative trade secrets, however, Next still has not identified precisely what proprietary information Viber (1) allegedly received and (2) used or transferred to a third party. De Prado, Next's 30(b)(6) witness, testified in his deposition that the only pages of Next's Phase I production that contain proprietary information or trade secrets are the slide presentations and the Yurchenko Declaration. (Def. 56.1 ¶ 45.) As discussed above, the slide presentations contain only rudimentary graphics and vague descriptions. Next has not identified what specific information in those presentations is "not generally available to the public" (Doc. No. 67-1 at 1). For example, in its complaint, Next alleged that the NxGn App "is not currently available for use by the general public" and "cannot be used without a code that is provided by Next." (Am. Comp. ¶¶ 16, 35.) As Viber points out, however, Next now appears to concede that the NxtGn App has been publicly available for download "99 percent of the time" since around 2012, the year before Next demonstrated the NxGn App to Viber. (*See* Def. 56.1 ¶ 72; Am. Compl. ¶ 35.) In his deposition, De Prado acknowledged that people who downloaded the app could "use

9

it and see how it would work." (Doc. No. 114-4 at 204.) To be sure, Next could conceivably have showed Viber features of the app that were unavailable to the public, but Next has produced no "hard evidence" to that effect, *D'Amico*, 132 F.3d at 149, "from which a reasonable inference in [Next's] favor may be drawn," *Binder & Binder*, 481 F.3d at 148.

Nor has Next shown how Viber allegedly used proprietary information for an impermissible purpose (*e.g.*, enhancing its own videoconferencing technology). Next's CEO, Maimon, stated in an affidavit that in 2014 he observed a Viber investor describing an "unfinished feature" on Viber's app in a way that sounded "nearly identical to a presentation [Maimon] had given to Viber regarding NxtGn's videoconferencing capabilities[.]" (Maimon Decl. ¶ 30.) Based on that vague observation – which does not even identify the presentation – Maimon concludes that Viber must have stolen technology from Next in violation of the NDA. *(See id.* ¶¶ 31–32.) But such "[c]onclusory allegations, conjecture, and speculation" cannot raise a genuine dispute of material fact at this stage of a litigation. *Kerzer*, 156 F.3d at 400.

In sum, Next has failed to provide adequate support for its claim that Viber breached the NDA by using Next's proprietary information in its own business or disclosed that information to third parties. The Court therefore grants summary judgment to Viber on Next's breach-of-contract claim.

C. Unjust Enrichment

To prevail on its unjust enrichment claim under New York law, Next must demonstrate that: "(1) [Viber] was enriched, (2) at [Next's] expense, and (3) equity and good conscience militate against permitting [Viber] to retain what [Next] is seeking to recover." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011) (citation omitted). However, "when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in . . . unjust enrichment . . . are generally precluded, unless based on a duty independent of the contract." *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011). Nonetheless, a claim for unjust enrichment may still proceed "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue." *Id.* (citation omitted).

Here, Next asserts vaguely that Viber enriched itself at Next's expense by appropriating a "secret . . . of value." (Pl. Opp'n at 10.) But Next does not appear to contest that any dispute regarding Viber's alleged misappropriation of secrets or proprietary information is covered by a contract – namely, the non-disclosure agreement. Nor does Next contend that Viber is bound by a "duty independent" of that agreement. *Poplar Lane*, 449 F. App'x at 59. Thus, Next's attempt to repackage its contractual claim as a claim for unjust enrichment must fail. *See id.* Moreover, to the extent that the dispute here falls outside the scope of the non-disclosure agreement, Next must still demonstrate specifically how "[Viber] was enriched . . . at Next's expense." *Ashland Inc.*, 652 F.3d at 339. Next has not done so. Because, as noted above, Next cannot identify any trade secrets or proprietary information with sufficient particularity, it cannot adequately identify an unjustly appropriated benefit. Thus, Next's unjust-enrichment claim fails.

10

D.  Attorneys' Fees and Sanctions

Having prevailed in this lawsuit, Viber urges the Court to impose sanctions on Next under Rule 37 of the Federal Rules of Civil Procedure. (Def. Mem. at 34–35.) *See* Fed. R. Civ. P. 37.  Specifically, Viber requests "dismissal of this [a]ction in its entirety with prejudice" and "all of [Viber's] attorneys' fees and costs incurred in defending against the [a]ction." (Def. Mem. at 35.)  The Court has already held that Viber is entitled to summary judgment on all of Next's claims, so that leaves only Viber's request for fees and costs.

Viber contends that Rule 37 sanctions are appropriate here because, in Viber's view, "Plaintiffs have wasted this Court's resources and caused Viber to spend many tens of thousands of dollars . . . to deal with this frivolous lawsuit," which was "commenced and pursued . . . in bad faith." (Def. Mem. at 34–35.)  Rule 37, however, addresses sanctions for discovery violations. *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 763 (1980).  And while it could be argued that Next's shifting theories of trade-secret misappropriation constituted a discovery violation, since they persisted throughout Phase I discovery, Viber's grievances seem more appropriate for a motion pursuant to Rule 11, 28 U.S.C. § 1927, or the courts' "inherent power to control their own proceedings," which "includes the power to impose appropriate monetary sanctions on counsel or a litigant, including the assessment of attorney[s'] fees." *Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 362 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x 845 (2d Cir. 2007) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)).  Indeed, Viber is principally challenging Next's good-faith belief at the outset of this litigation that its claims were not groundless, a charge that clearly falls within the ambit of Rule 11, not Rule 37. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (noting that "the central purpose of Rule 11 is to deter baseless filings in district court") Accordingly, since Viber does not cite any basis for sanctions other than Rule 37, which is inapposite, the Court denies Viber's sanctions motion.

Viber also contends that it is entitled to its attorneys' fees, costs, and expenses pursuant to a fee-shifting provision in the NDA.  In relevant part, Paragraph 11 of the NDA provides that "[i]f any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and paralegal fees, costs and expenses[.]" (Doc. 67-1 at 3–4.)  This case appears to fall within the plain terms of that provision, and indeed, Next does not appear to contend otherwise. (*See generally* Pl. Opp'n.)  And where "a contract authorizes an award of attorneys' fees," as the NDA does here, such an award is mandatory. *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1313 (2d Cir. 1993).  However, since the fee-shifting provision here is contractual, and since the Court is only now granting summary judgment to Viber, Viber's request for fees under the NDA is premature.  As of this moment, neither party has had the opportunity to exercise its rights under the fee-shifting provision, and neither party is in breach of that provision. *Cf. Bellevue v. Kafka*, No. 92 C 4589, 1994 WL 127213, at *2 (N.D. Ill. Apr. 7, 1994) (declining to treat a claim for attorney's fees as a compulsory counterclaim because the claim was "premature until after the original suit was adjudicated").  Accordingly, if Viber wishes to seek attorney's fees pursuant to the NDA, it should first demand them from Next; if Next refuses the demand, then Viber may file a complaint for breach of the fee-

11

shifting provision, either in this district, where it will likely be deemed related and assigned to this Court's docket (*see* Local Rule 13), or elsewhere. *See Cumberland Farms, Inc. v. Lexico Enterprises, Inc.*, No. 10-CV-4658 (ADS) (AKT), 2012 WL 526716, at *9 (E.D.N.Y. Feb. 16, 2012) (concluding that the prevailing party could "perhaps" have sought contractual attorneys' fees in a counterclaim, but awarding fees in a separate action).

### IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT Defendant's motion for summary judgment is GRANTED, and Defendant's motions for sanctions and fees are DENIED. The Clerk of the Court is respectfully directed to terminate the motion pending at docket number 111, enter judgment for Defendant, and close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 30, 2017
New York, New York

\*   \*   \*

Plaintiffs are represented by Simon S. Kogan, Esq., 27 Weaver Street, Staten Island, NY 10312.

Defendant is represented by Jeffrey Weingart, Jeffrey Kimmel, and Susan Schlesinger of Meister Seelig & Fein LLP, 125 Park Avenue, 7th Fl., New York, NY 10017.